FAIR, J.,
for the Court:
¶ 1. “Margaret Jones” and “David Brown” had a daughter, “Christina,” out of wedlock.[1] After they broke up, David took Christina and sued for custody. Margaret’s mother intervened, contending that neither natural parent was fit because of their histories of drug use. The chancery court found the natural-parent presumption intact and awarded custody to David. Margaret appeals. As the chancellor’s findings are supported by substantial evidence, we affirm.
FACTS
¶ 2. Margaret and David began an “on again, off again” romantic relationship in 2008. Christina was born in November 2011. The extent of David’s attention to the pregnancy was disputed. However, a few months after Christina was born, the parties moved into a house together in Jackson. They lived there until September 2012, when David took the child and left. Prior to trial, the Hinds County Chancery Court ordered temporary joint custody alternately on a weekly basis.
¶ 8. David admitted he had a history of substance abuse going back twenty years or more. He testified that he had successfully completed rehabilitation in 2010 and was no longer using drugs; but Margaret was still addicted to prescription medicines and crystal methamphetamine. Margaret denied ever abusing drugs, but during the course of the litigation, she did not fully cooperate with court-ordered drug testing and on one occasion tested positive for crystal methamphetamine. Margaret alleged that David was physically and mentally abusive and was still addicted to drugs. She claimed that David had been passing drug tests by using someone else’s urine.
¶ 4. The chancellor did not find Margaret’s allegations credible, and awarded custody to David based on his rehabilitation, steady employment, and superior living conditions.
¶ 5. Margaret’s mother abandoned her claims of neglect or abuse when she testified at trial, and she has not appealed the denial of her petition.
STANDARD OF REVIEW
¶ 6. The standard of review in domestic-relations cases is limited. Arrington v. Arrington, 80 So.3d 160, 164 (¶ 11) (Miss.Ct.App.2012) (citing In re Dissolution of Marriage of Wood, 35 So.3d 507, 512 (¶ 8) (Miss.2010)). This Court will not reverse a chancellor’s findings concerning modification of custody unless the chancellor was manifestly wrong or clearly erroneous, or applied an improper legal standard. In re E.C.P., 918 So.2d 809, 822 (¶ 58) (Miss.Ct.App.2005) (citing Hensarling v. Hensarling, 824 So.2d 583, 587 (¶ 8) (Miss.2002)).
*922 ¶ 7. In appeals from child-custody decisions, our polestar consideration, like the chancellor’s, must be the best interest of the child. Montgomery v. Montgomery, 20 So.3d 39, 42 (¶ 9) (Miss.Ct.App. 2009) (citing Hensarling, 824 So.2d at 587 (¶8)). “So long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor’s decision, this Court may not intercede simply to substitute our collective opinion for that of the chancellor.” Hammers v. Hammers, 890 So.2d 944, 950 (¶ 14) (Miss.Ct.App.2004) (quoting Bower v. Bower, 758 So.2d 405, 412 (¶ 33) (Miss.2000)).
DISCUSSION
¶ 8. We have rearranged Margaret’s three issues for the purpose of our analysis.
1. Guardian Ad Litem
¶ 9. Because there were allegations of neglect, the chancellor appointed a guardian ad litem for Christina. The chancellor chose a law student from Mississippi College School of Law, Thujee Lhendup, who was admitted to limited practice under the supervision of Shirley Kennedy, a professor who is also a licensed attorney. Lhendup was assigned to investigate the allegations and make recommendations as to Christina’s best interest, as an arm of the court. The chancellor was very complimentary of Lhendup’s performance, describing him as exceptionally energetic and thorough. The record bears that out.
¶ 10. Margaret takes issue not with the guardian ad litem’s execution of his duties, but with the nature of his assignment. She contends that the chancellor was required to appoint a guardian ad litem to act as an attorney for Christina, not one who would investigate and make recommendations as an arm of the court. Margaret’s argument is based on the Mississippi Supreme Court’s decision in S.G. v. D.C., 13 So.3d 269, 280-81 (¶ 47) (Miss. 2009), where the court discussed the importance of clearly defining the role of the guardian ad litem:
In Mississippi jurisprudence, the role of a guardian ad litem historically has not been limited to a particular set of responsibilities. In some cases, a guardian ad litem is appointed as counsel for minor children or incompetents, in which case an attorney-client relationship exists and all the rights and responsibilities of such relationship arise. In others, a guardian ad litem may serve as an arm of the court — to investigate, find facts, and make an independent report .to the court. The guardian ad litem may serve in a very limited purpose if the court finds such service necessary in the interest of justice. Furthermore, the guardian ad litem’s role at trial may vary depending on the needs of the particular case. The guardian ad litem may, in some cases, participate in the trial by examining witnesses. In some cases, the guardian ad litem may be called to testify, and in others, the role may be more limited.
Margaret latches onto language from another case, In re R.D., 658 So.2d 1378, 1384 (Miss.1995), where the supreme court held minors had a due process right to “representation by” a guardian ad litem when abuse or neglect was alleged. See also Miss. Code Ann. § 93-5-23 (Rev. 2013); Miss.Code Ann. § 43-21-121 (Rev. 2009). From this Margaret argues that the chancery court was required to appoint a guardian ad litem to represent Christina as her attorney and not as an arm of the court.
¶ 11. This argument is erroneous and relies on cherry picking language from In *923 re R.D. In fact, the court there repeatedly stated that (in the context of a termination of parental rights proceeding where abuse or neglect is at issue) the guardian ad litem had a duty to represent the child’s best interest. See id. at 1382-83, 1386. The court cited with approval cases outlining the role of a guardian ad litem as an arm of the court. See id. at 1383 (citing Short v. Short, 730 F.Supp. 1037, 1038 (D.Colo.1990); Shainwald v. Shainwald, 302 S.C. 453, 395 S.E.2d 441, 444 (Ct.App. 1990)).
¶ 12. Moreover, the supreme court in S.G. v. D.C. made a point of emphasizing that prior dictates of that court had been confusing or ambiguous on the proper role of a guardian ad litem. The court urged chancellors to make it clear what was expected:
We find no fault with any of these diverse duties and responsibilities a chancellor might assign to a guardian ad litem in a particular case. However, we encourage chancellors to set forth clearly the reasons an appointment has been made and the role the guardian ad litem is expected to play in the proceedings. To avoid potential problems regarding confidential communications and other expectations, chancellors should make clear: (1) the relationship between the guardian ad litem and the children, incompetent, or other ward of the court; (2) the role the guardian ad litem will play in the trial; and (3) the expectations the trial judge has for the guardian ad litem. The role a chancellor expects a guardian ad litem to play should be set forth clearly in the written order of appointment. Doing so will make the guardian ad litem’s relationships and general responsibilities clear to each of the parties (including those wards old enough to comprehend), the attorneys, the court, and to the guardian ad litem.
S.G., 13 So.3d at 281 (¶48). The Court also acknowledged that the chancellor must have discretion and flexibility in defining the guardian’s duties on a case-by-case basis:
Setting out such expectations should not permanently bind the court should needs change as .the litigation progresses. Judges may revise these expectation by order as the need arises, so long as the guardian ad litem is not required to breach client confidences .or other ethical duties by the change in responsibilities. Chancellors should be free to assign duties to a guardian ad litem as the needs of a particular case dictate, and the role of the guardian ad litem should at all times be clear.
Id. at (¶ 49).
¶ 13. Furthermore, in distinguishing between the two roles of a guardian ad litem, the S.G. court cited a case involving allegations of abuse or neglect as its example of an instance where the guardian ad litem should serve the role of investigator and arm of the court. See id. at (¶ 43) (citing S.N.C. v. J.R.D. Jr., 755 So.2d 1077, 1082 (¶¶ 15-17) (Miss.2000)). The example where the guardian ad litem should act more strictly as the child’s fiduciary or attorney was a will contest in which the child was a beneficiary. Id. (citing In re Prine’s Estate, 208 So.2d 187, 192 (Miss. 1968)). The court in S.G. also discussed potential concerns about confidentiality, but that was clearly not an issue in this case, as Christina was not old enough to meaningfully communicate with someone she believed was her attorney. See id. at 282 (¶¶ 53-54).
¶ 14. The record reflects that the guardian ad litem in this case was properly directed to act as an arm of the court in representing the best interest of the child, and he executed that duty faithfully. This issue is without merit.
*924 2. Domestic Violence
¶ 15. Next, we consider Margaret’s argument that David should have been found “unfit” based on her allegations of domestic violence.[2] She points out that David pled guilty to misdemeanor domestic violence relating to an incident with Margaret in 2010. David admitted that he and Margaret had fought on various occasions, but he characterized the fighting as mutual and without a significant physical dimension. Margaret’s claims of severe violence were largely generalized and never corroborated. The guardian ad litem also noted an incident where, during the pendency of this custody dispute, Margaret had falsely accused David of violence in an apparent attempt to avoid a drug test.[3]
¶ 16. Margaret raises this issue for the first time on appeal, and her argument is cursory. She cites only foreign authority and erroneously states that Mississippi does not have a statutory scheme relating to domestic violence in custody cases. In fact, Mississippi Code Annotated section 93-5-24(9)(a) (Rev. 2013) covers exactly that, providing in relevant part:
In every proceeding where the custody of a child is in dispute, there shall be a rebuttable presumption that it is detrimental to the child and not in the best interest of the child to be placed in sole custody, joint legal custody or joint physical custody of a parent who has a history of perpetrating family violence. The court may find a history of perpetrating family violence if the court finds, by a preponderance of the evidence, one (1) incident of family violence that has resulted in serious bodily injury to, or a pattern of family violence against, the party making the allegation or a family household member of either party. The court shall make written findings to document how and why the presumption was or was not triggered.
¶ 17. We note that the chancellor did not make written findings regarding either Margaret or David’s allegations of domestic violence by the other. However, given the nature of the allegations and the parties’ failure to directly raise the issue before the chancery court, we do not find it to be reversible error in this instance. This issue is without merit.
3. Albright Factors
¶ 18.. Finally, we consider Margaret’s argument that the chancellor erred in awarding custody of Christina to David based on her application of the familiar *925 Albright factors. See Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983).
¶ 19. In Albright, our supreme court held that the best interest of the child must control in all custody decisions, and this principle has been adopted by the Legislature in Mississippi Code Annotated section 93-5-24. In determining the best interest of the child in custody disputes, it is the court’s duty to consider that the relationship of parent and child is for the benefit of the child, not the parent. See Reno v. Reno, 253 Miss. 465, 475, 176 So.2d 58, 62 (1965) (citing J.W. Bunkley Jr. & W.E. Morse, Bunkley and Morse’s Amis on Divorce and Separation in Mississippi § 8.01 (2d ed. 1957)).
¶ 20. To determine where the child’s best interest lies, chancellors must consider the following factors when evaluating the fitness of each parent: (1) age, health, and sex of the children; (2) continuity of care; (3) parenting skills and the willingness and capacity to provide primary child care; (4) employment responsibilities of the parents; (5) physical and mental health and age of the parents; (6) moral fitness of the parents; (7) emotional ties of the parents and children; (8) home, school, and community records of the children; (9) preference of children twelve years of age or older; (10) stability of the home environment and employment of each parent; and (11) other relevant factors in the parent-child relationship. Al-bright, 437 So.2d at 1005.
¶ 21. The chancellor is required to address each of the Albright factors that is applicable to the case before her. See Powell v. Ayars, 792 So.2d 240, 244 (¶ 10) (Miss.2001). However, she need not decide that every factor favors one parent over the other. See Weeks v. Weeks, 989 So.2d 408, 411 (¶ 12) (Miss.Ct.App.2008). Nor is Albright a mathematical formula where custody must be awarded to the parent who “wins” the most factors. Lee v. Lee, 798 So.2d 1284, 1288 (¶ 15) (Miss. 2001). Instead, the Albright factors exist to ensure the chancellor considers all the relevant facts relating to the child’s best interest. “All the factors are important, but the chancellor has the ultimate discretion to weigh the evidence the way [s]he sees fit.” Johnson v. Gray, 859 So.2d 1006, 1013-14 (¶ 36) (Miss.2003).
¶ 22. The chancellor acknowledged that this case was difficult because of the past misconduct of the parties, particularly their drug use. She found it decisive that David admitted his prior drug addiction and had a record of recent rehabilitation, a steady job, and a home; while Margaret was unemployed, planned to move in with her mother, and denied using illegal drugs despite significant evidence of her drug use, including her testing positive for crystal methamphetamine during the pendency of the custody dispute.[4] The chancellor found most of the Albright factors nominally neutral,- though often favoring David to some extent. The exceptions were the age and sex of the child, which favored Margaret, and the willingness/capacity to provide child care and stability of the home environment, which favored David. The chancellor also acknowledged her reluctance to separate Christina from her five-year-old half-sister, who was in Margaret’s custody.
¶ 23. The chancellor concluded by saying that this was a difficult case given the parties’ histories, but: “[David] at this *926 point in time is financially stable, has exhibited rehabilitation from his previous lifestyle, [and] has exhibited an attitude more so than [Margaret] to ensure that there is a relationship between the parents.”
¶ 24. On appeal, Margaret takes issue with the chancellor’s findings on two of the Albright factors. First, she claims the chancellor did not consider continuity of care; but this is clearly belied by the record. She also argues the chancellor had to find that this factor favored her, but the testimony at trial was that she and David had moved in together shortly after Christina was.born. Numerous witnesses described David as Christina’s primary caregiver while the parents were together, and it was David who took Christina after the breakup. During the pendency of the litigation, custody was shared between the parties on alternating weeks. Margaret also alleges that David should not be credited with caring for Christina because he “gave [her] to his mother” after the breakup, but this seems to be unsupported by the record.
¶ 25. She next argues the chancellor failed to properly consider the moral fitness of the parties, based on David’s admitted history of drug use and the fact that he had two other children from prior marriages that had been adopted, with David’s consent, by members of his family. But contrary to Margaret’s allegation, the chancellor expressly noted this during her analysis. She did not give it much negative weight, however, because it was uncontested that the adoptions had been in the children’s best interest at the time. At any rate, it is clear that the chancellor considered the consequences of David’s history of drug use, including its impact on his older children.
¶ 26. After reviewing the record, we are satisfied that the chancellor’s award of custody to David is not manifestly erroneous and is supported by substantial evidence. Margaret’s arguments to the contrary are without merit.
¶ 27. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION.

. Because there are allegations of neglect or abuse of a child, we have changed the names . of the individuals involved.

. She also contends that David has three convictions for driving under the influence, but this does not seem to be substantiated in the record.

. The guardian ad litem testified that Margaret claimed she could not take the drug test because she was filing domestic violence charges. However, the charges were not actually filed until some time later. At trial Margaret admitted there had been no physical violence in that incident, but she alleged that the charges were substantiated by David’s entry into her home. David testified at trial that a mutual friend had told him Margaret was passed out and that Christina and her older half-sister were unattended. David had called the guardian ad litem and the police before the friend let him into the house. He found the house in a state of disorder and was unable to wake Margaret, although the police officer who arrived ultimately did. Margaret claimed she was just napping after staying up late taking care of a sick child the night before. She also alleged that David had gone through her things before the police officer arrived.
. Margaret eventually consented to have her hair tested for drug use. The technician who took the sample testified that Margaret appeared to have altered her hair in an effort to produce a false negative result. Ultimately, the sample was lost in transit to the laboratory and was never tested.

. Margaret claimed the results were a false positive caused by her use of a validly prescribed medication, but she did not offer any expert testimony to that effect. The technician who took the sample testified that the test was specifically for illegal crystal methamphetamine and that prescription medicines could not produce a false positive.