# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00041-COA

JENNIFER CARTER                                                    APPELLANT

v.

JOSH CARTER                                                          APPELLEE

DATE OF JUDGMENT:                09/20/2013
TRIAL JUDGE:                     HON. JOHN S. GRANT III
COURT FROM WHICH APPEALED:       RANKIN COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:         GLENN S. SWARTZFAGER
                                 JAMES CHRISTOPHER WALKER
ATTORNEY FOR APPELLEE:           ANSELM J. MCLAURIN
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
TRIAL COURT DISPOSITION:         CUSTODY OF CHILD MODIFIED;
                                 CUSTODY AWARDED TO FATHER
DISPOSITION:                     AFFIRMED: 10/06/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

EN BANC.

FAIR, J., FOR THE COURT:

¶1.    The Rankin County Chancery Court granted Josh Carter's petition to modify the custody of his six-year-old daughter, Delaney, who had been in the care of her mother, Jennifer. On appeal, Jennifer asserts a single error. She contends that the chancery court erred in not appointing a guardian ad litem, sua sponte, to investigate what she argues were Josh's allegations of neglect. We find that the allegations were either not severe enough to require investigation or were adequately investigated by an agent of the court who acted as a guardian ad litem in all but name. We affirm.

## DISCUSSION

¶2. Josh and Jennifer Carter divorced in Rankin County in 2011, and Jennifer got custody of Delaney. After the divorce, Jennifer changed jobs and moved several times, ending up living near her mother near Lumberton, Mississippi, about two hours south of the Carters' original home.

¶3. In May 2012, Josh filed a complaint for modification which alleged, without specificity, that there had been a material change in circumstances that had adversely impacted Delaney, tracking the language of the legal standard for custody modification. *See, e.g., A.M.L. v. J.W.L.*, 98 So. 3d 1001, 1015-16 (¶35) (Miss. 2012). As the litigation progressed, two bases for the finding of a material change in circumstances emerged: the condition of Jennifer's residence, and Delaney's health issues and care while in Jennifer's custody.

¶4. About six months after filing his complaint for modification, Josh filed a "Request for Inspection" of Jennifer's home, pursuant to Mississippi Rule of Civil Procedure 34. No basis for the request was stated on the motion's face, and, although it appears to have been heard before the chancery court, the hearing on the motion was not transcribed or its substance otherwise made a part of the record on appeal. Following the hearing, the chancellor found that it would not be appropriate for Josh or his attorney to inspect Jennifer's property. Instead, he entered an order[1] appointing Heather M. Aby, an attorney, to inspect Jennifer's home and submit a report to the court.

---

[1] There were actually two orders, with the first appointing a different attorney to make the inspection (which never occurred). For simplicity, we take them together.

¶5.    Aby prepared what she styled a "Report of Guardian Ad Litem" detailing her findings. She found that Jennifer and Delaney were residing in a one-bedroom mobile home that had been previously used by an auto repair shop. The building was "structurally unsound and in a state of disrepair." In one place, the roof had been covered with a tarp, which was held down by an old tire. The inside was cluttered and bore stains from water intrusion, accompanied by what looked like mold. The yard surrounding the building was overgrown and littered with garbage, including old furniture and appliances, as well as a rusted metal fan lying in high grass that Aby thought would be dangerous to a small child. Aby also inspected a building that was under construction on the property, which Jennifer called a "cabin" and her future home – Aby characterized it as a utility building or shed that was being half-heartedly converted into a residence, and she expressed concern that it could be a fire hazard because there was only one entry door (though it did have several small windows). Aby concluded that Jennifer's home was "generally not safe for a minor child," and she recommended that it was not in Delaney's best interest to live in either the mobile home or the cabin.

¶6.    Aby testified at trial, and her report and accompanying photographs were introduced into evidence. The chancellor largely agreed with Aby's report and recommendation, finding Jennifer's home to be "shocking," "squalid," and "dangerous."

¶7.    Neither party ever asked the chancery court to appoint a guardian ad litem. Jennifer's sole issue on appeal is her contention that the chancellor erred by not sua sponte ordering the appointment of a guardian ad litem following Aby's testimony regarding her home, which

3

Jennifer contends amounted to an allegation she had neglected Delaney.

¶8. Josh argues that this issue has been waived. He asserts that, at some point, the chancellor raised the issue of whether a guardian ad litem should be formally appointed, and both parties agreed it was unnecessary. But if this occurred, it was not transcribed or otherwise made a part of the record; and this Court cannot credit assertions in briefs in the absence of support in the record. *Yancey v. Yancey*, 752 So. 2d 1006, 1012 (¶20) (Miss. 1999).

¶9. Ordinarily, the decision of whether to appoint a guardian ad litem is entrusted to the sound discretion of the chancellor. *Scroggins v. Riley*, 758 So. 2d 467, 472 (¶19) (Miss. Ct. App. 2000). But when there are allegations of abuse or neglect in a custody dispute, the Mississippi Supreme Court has held that Mississippi law requires the chancery court to appoint a guardian ad litem to investigate the allegations. *Floyd v. Floyd*, 949 So. 2d 26, 28 (¶7) (Miss. 1995) (citing Miss. Code Ann. § 93-5-23 (Supp. 2006)).

¶10. Neither Aby nor Josh expressly accused Jennifer of neglecting Delaney. Jennifer testified, without objection, that her home had been investigated by the Mississippi Department of Human Services and that the case had been closed. From the transcript, it appears that records from the Lamar County DHS may have been sent to the chancellor prior to the trial on the modification action, but, at the beginning of the modification trial, the chancellor stated he had not yet opened what he had received. A discussion then apparently occurred off the record, and whatever records had been sent were never mentioned again on the record. The DHS records were not cited by the chancellor in his findings of fact, used

4

by either party at trial, or otherwise made part of the record on appeal.

¶11. Assuming for the sake of argument that Aby's testimony amounted to an allegation of neglect, we still find that no error occurred. Undoubtedly, Aby's appointment was irregular and her instructions somewhat unclear. Her appointment was purportedly pursuant to Mississippi Rule of Civil Procedure 34, which allows inspection of property by a party or his attorney. The order, although reciting that the court found it inappropriate for Josh or his attorney to inspect Jennifer's property, refers to Aby's assignment as a "Rule 34 inspection" and required Josh to pay Aby's fee. From this, Jennifer asserts that Aby "could easily be viewed" as Josh's proxy or agent. But Jennifer does not actually make that argument – Aby, the parties, and the court all seem to have understood Aby to have been assigned to act as a neutral, investigative agent for the court; and at no point does she appear to have acted as Josh's agent or advocate. Aby was ordered to report to the court, and she, initially at least, appears to have understood her assignment to be that of a guardian ad litem, as that was how she styled her report. At the modification hearing, the chancellor initially referred to Aby as a guardian ad litem before backing off that label to call her "an observer, basically, or someone to make a report." The chancellor also recalled that Aby "was not formally appointed as an arm of the Court except for the limited issue of performing, I think, an inspection."

¶12. Jennifer does not argue that a guardian ad litem should have been appointed to simply rehash the investigation undertaken by Aby. Instead, she argues that a guardian ad litem was required to present a "panoramic" investigation of Delaney's circumstances. However, the

5

Mississippi Supreme Court in the landmark decision of *S.G. v. D.C.,* 13 So. 3d 269, 280-81 (¶47) (Miss. 2009), discussed the various roles a guardian ad litem can play in a chancery case, and it emphasized that the chancellor must have discretion in crafting the guardian ad litem's duties to the specific needs of the case at hand:

> In Mississippi jurisprudence, the role of a guardian ad litem historically has not been limited to a particular set of responsibilities. In some cases, a guardian ad litem is appointed as counsel for minor children or incompetents, in which case an attorney-client relationship exists and all the rights and responsibilities of such relationship arise. In others, a guardian ad litem may serve as an arm of the court – to investigate, find facts, and make an independent report to the court. The guardian ad litem may serve in a very limited purpose if the court finds such service necessary in the interest of justice. Furthermore, the guardian ad litem's role at trial may vary depending on the needs of the particular case. The guardian ad litem may, in some cases, participate in the trial by examining witnesses. In some cases, the guardian ad litem may be called to testify, and in others, the role may be more limited.

In this case, Aby was appointed for a specific purpose – to investigate Jennifer's home environment – just as the supreme court contemplated in *S.G. v. D.C.*

¶13.    Jennifer also contends that Delaney should have been appointed a guardian ad litem to serve as her attorney. We recently rejected the same argument in *Jones v. Brown*, 154 So. 3d 919, 923 (¶13) (Miss. Ct. App. 2015). This Court noted that the supreme court in *S.G. v. D.C.* had cited allegations of abuse or neglect as an instance where the guardian ad litem should serve as an investigator and an arm of the court, representing the child's best interest in the stead of the child directly. *Id.* (citing *S.G.*, 13 So. 3d at 281 (¶48)). From our review of the record, that is exactly what Aby did, notwithstanding that she renounced the guardian ad litem label when she testified at trial. The example the supreme court gave of a case where the guardian ad litem should act as the child's attorney was a will contest in which the

6

child was a beneficiary. *S.G.*, 13 So. 3d at 282 (¶¶53-54) (citing *In re Prine's Estate*, 208 So. 2d 187, 192 (Miss. 1968)).

¶14. This Court has held that the failure to appoint a guardian ad litem can be harmless error. *See Loomis v. Bugg*, 872 So. 2d 694, 697 (¶¶11-12) (Miss. Ct. App. 2004). From our review of the record, we are satisfied that Aby, although not formally appointed a guardian ad litem, sufficiently fulfilled that role such that no reversible error resulted.

¶15. Jennifer also contends that the chancellor should have appointed a guardian ad litem to investigate what she characterizes as Josh's claims she had neglected Delaney's medical and nutritional needs. In particular, she cites to Josh's attorney's questioning of Dr. Naznin Dixit, a pediatrician who had treated Delaney, during her deposition (which was an evidentiary deposition submitted into evidence at the trial).

¶16. Our analysis of this issue is made more difficult because our supreme court has not elaborated on what sort of allegations are required, or when or how those allegations must be made, in order to make the appointment of a guardian ad litem mandatory. Neglect is difficult to define and could arguably be present, to some degree, in mundane allegations of imperfect parenting that should not demand investigation by a guardian ad litem. Jennifer's implicit argument that any suggestion of neglect requires the appointment of a guardian ad litem would amount to a de facto rule that a guardian ad litem must be appointed in most custody disputes.

¶17. Because our supreme court has always predicated the guardian-ad-litem requirement on the Mississippi Youth Court Law and related statutes, we look there for guidance. The

7

Youth Court Law generally places exclusive original jurisdiction over "all proceedings concerning . . . a neglected child [or] an abused child" in the youth court. Miss. Code Ann. § 43-21-151 (Supp. 2014). But it provides an exception for when proceedings related to the custody of the child have already been initiated in the chancery court. Section 43-21-151(1)(c) provides:

> When a charge of abuse of a child first arises in the course of a custody action between the parents of the child already pending in the chancery court and no notice of such abuse was provided prior to such chancery proceedings, the chancery court may proceed with the investigation, hearing and determination of such abuse charge as a part of its hearing and determination of the custody issue as between the parents, notwithstanding the other provisions of the Youth Court Law. The proceedings in chancery court on the abuse charge shall be confidential in the same manner as provided in youth court proceedings.

Similarly, section 93-5-23 (Rev. 2013) provides in relevant part:[2]

> The [chancery] court may investigate, hear and make a determination in a custody action when a charge of abuse and/or neglect arises in the course of a custody action as provided in Section 43-21-151, and in such cases the court shall appoint a guardian ad litem for the child as provided under Section 43-21-121, who shall be an attorney. Unless the chancery court's jurisdiction

---

[2] Likewise, Mississippi Code Annotated section 93-11-65(4) (Rev. 2013) provides (in relevant part):

When a charge of abuse or neglect of a child first arises in the course of a custody or maintenance action pending in the chancery court pursuant to this section, the chancery court may proceed with the investigation, hearing and determination of such abuse or neglect charge as a part of its hearing and determination of the custody or maintenance issue as between the parents, as provided in Section 43-21-151, notwithstanding the other provisions of the Youth Court Law. The proceedings in chancery court on the abuse or neglect charge shall be confidential in the same manner as provided in youth court proceedings, and the chancery court shall appoint a guardian ad litem in such cases, as provided under Section 43-21-121 for youth court proceedings, who shall be an attorney.

has been terminated, all disposition orders in such cases for placement with the Department of Human Services shall be reviewed by the court or designated authority at least annually to determine if continued placement with the department is in the best interest of the child or public.

Section 93-5-23 cites section 43-21-121(1)(e) (Rev. 2009), which states in relevant part that "[t]he youth court shall appoint a guardian ad litem for the child . . . [i]n every case involving an abused or neglected child which results in a judicial proceeding." Moreover, the Uniform Rules of Youth Court Practice apply to "any chancery court proceeding when hearing, pursuant to section 93-11-65 . . . an allegation of abuse or neglect when that first arises in the course of a custody or maintenance action." U.R.Y.C.P. 2(a)(2).

¶18. We conclude that since the requirement of appointing a guardian ad litem in chancery cases derives from an exception to the youth court's jurisdiction over abused or neglected children, to trigger the guardian-ad-litem requirement, the allegations of neglect must be of sufficient severity such that, if proven, they would have triggered the youth court's jurisdiction had there not already been proceedings in the chancery court. In other words, they must amount to an allegation that the child was a neglected child as defined by the Youth Court Law. It defines a neglected child as one:

> (i) Whose parent, guardian or custodian or any person responsible for his care or support, neglects or refuses, when able so to do, to provide for him proper and necessary care or support, or education as required by law, or medical, surgical, or other care necessary for his well-being; however, a parent who withholds medical treatment from any child who in good faith is under treatment by spiritual means alone through prayer in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof shall not, for that reason alone, be considered to be neglectful under any provision of this chapter; or

> (ii) Who is otherwise without proper care, custody, supervision or support; or

9

(iii) Who, for any reason, lacks the special care made necessary for him by reason of his mental condition, whether the mental condition is having mental illness or having an intellectual disability; or

(iv) who, for any reason, lacks the care necessary for his health, morals or well-being.

Miss. Code Ann. § 43-21-105(l) (Supp. 2014).

¶19.   Among children her age, Delaney was in the third percentile of height (within the "normal" range, but just barely) and below the third percentile in weight, which resulted in a diagnosis of "failure to thrive."  At the deposition, Josh's attorney repeatedly asked Dr. Dixit questions regarding whether Jennifer's home conditions or lack of attention to Delaney's nutrition may have contributed to her being underweight.  Josh also contended that Delaney gained weight while visiting him, only to lose it after returning to Jennifer.  Dr. Dixit was very resistant to these suggestions; she testified that Delaney was diagnosed with failure to thrive based solely on her weight relative to her peers and that she could not find a reason for it.  Dr. Dixit admitted that poor nutrition could have contributed, but there was no evidence of that, and at the time of her examination, Delaney appeared to have been gaining weight steadily and at the expected pace for some time.  She noted also that Delaney had been born very prematurely, that both her parents were shorter than average, and that Josh's method of weighing Delaney was unreliable.  Dr. Dixit had found no evidence that Delaney was abused or neglected.

¶20.   Aby, during her inspection of Jennifer's home, had found the kitchen fully stocked with food, though she did not otherwise investigate whether Delaney's nutritional needs were being met while in Jennifer's care.

10

¶21. There was also testimony that Jennifer had missed or delayed numerous checkups for Delaney, particularly dental ones. And on one occasion, when Josh picked up Delaney, she was suffering from a fever. Jennifer told Josh she had consulted a doctor who had told her to watch Delaney's temperature, but Josh took Delaney to the emergency room where she was diagnosed with strep throat that had advanced to scarlet fever. Josh also asked questions regarding a stye that had persisted near Delaney's eye for several months.

¶22. The chancellor seems to have ultimately given little weight to these allegations, other than noting that Jennifer's home environment could have had some harmful effects on Delaney and that Josh had been more attendant to her care. In his *Albright*[3] analysis, the chancellor found that Delaney's health and related matters "slightly" favored Josh.

¶23. Given the wide range of conduct that could arguably constitute neglect, this Court has held that when neglect is not expressly alleged, the question of whether it has been effectively alleged is entrusted to the sound discretion of the chancellor. *See Johnson v. Johnson*, 872 So. 2d 92, 94 (¶8) (Miss. Ct. App. 2004). In this case, the chancellor clearly did not take the allegations and evidence presented regarding Delaney's health and care in Jennifer's custody as possessing the weight and severity of an allegation that she was a neglected child under the Youth Court Law, and we cannot say there was an abuse of discretion in the failure to appoint a guardian ad litem to investigate.

¶24. We conclude that no reversible error resulted from the chancellor's not appointing a

---

[3] *See Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

guardian ad litem sua sponte, and so we affirm the chancery court's judgment.[4]

¶25. **THE JUDGMENT OF THE CHANCERY COURT OF RANKIN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON AND MAXWELL, JJ., CONCUR. WILSON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. IRVING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. JAMES, J., NOT PARTICIPATING.**

**IRVING, P.J., DISSENTING:**

¶26. It seems clear to me from reading the record that Jennifer's right to due process was abridged, thereby denying her a fair hearing and resulting in the loss of custody of Delaney. I am aware that Jennifer's issue on appeal is that the chancellor erred in not appointing sua sponte a guardian ad litem (GAL). I am also aware that our law is well settled that in every custody dispute, the polestar consideration is the best interest of the minor child. However, in my judgment, the failure of a chancellor to appoint a GAL when the chancellor is statutorily required to do so implicates a denial of due process that brings into question whether the child's best interest has been served. It also seems clear to me that Jennifer's economic situation, not her failure to adequately care for her daughter, was the reason for her loss of custody. Since our jurisprudence guarantees every American citizen due process of law before valuable rights may be withdrawn by the State and prohibits the awarding or

---

[4] The dissent contends that *Jennifer* was denied due process. We think it important to note that this is not an issue she has raised on appeal – Jennifer argues that *Delaney* was denied due process; she makes no such argument for herself. The dissent also argues that the evidence was not sufficient to find a material change in circumstances, but Jennifer did not raise that issue, either. This Court does not address issues not raised by the parties except in the case of plain error, and these issues do not rise to that level. *Walker v. Gunn*, 955 So. 2d 920, 926 (¶18) (Miss. Ct. App. 2007).

12

modification of custody based solely on one's economic station in life, I must dissent. However, I do so with due respect to both the majority and the chancellor who heard this matter.

¶27. Our jurisprudence is clear that before there can be a change in a prior custodial arrangement, a material change in circumstances that adversely affects the minor child must have occurred. The phrase "must have occurred" means that the prejudicial change must have arisen since the initial custody order.

¶28. In order to elucidate the point that I make regarding the deprivation of due process suffered by Jennifer and her resulting loss of custody of Delaney, it is necessary that I set forth in chronological order the critical procedural facts contained in the record, as well as the substantive facts. I recite the procedural facts first, reserving my discussion of the substantive facts until my discussion of the issue.

¶29. Josh and Jennifer were divorced on June 8, 2011, and Jennifer was awarded custody of Delaney, who was four years old. On May 23, 2012, Jennifer sent a letter to the clerk of the Chancery Court of Rankin County, advising the clerk of her new address in Lumberton, Mississippi. Two days later, on May 25, 2012, Josh filed his motion for modification of custody. In my opinion, it is noteworthy that in his motion, Josh did not allege any facts explaining the alleged material change in circumstances that was adversely affecting Delaney's well-being. I quote the totality of his averment: "Since entry of the former [j]udgment of [d]ivorce, certain material changes in circumstances have occurred which have had and will likely continue to have an adverse impact upon [Delaney]. Such changes in

13

circumstances justify a modification of the former [j]udgment to award custody of the minor child to [Josh]."

¶30. On May 29, 2012, the clerk issued a summons to Jennifer, commanding her to appear and defend against Josh's motion for modification on October 16, 2012, at 9:00 a.m. Although the summons was not denoted a summons under Rule 81 of the Mississippi Rules of Civil Procedure, that must have been the kind of summons it was. I should note that the docket and the record do not reflect an order setting Josh's motion for hearing on October 16, 2012, nor is there an order continuing the motion for hearing to a later date. In any event, the hearing was not held until July 18, 2013, and September 11, 2013.

¶31. On October 5, 2012, eleven days before the scheduled hearing on Josh's motion for modification, Josh issued notice to take Jennifer's deposition by oral examination on October 10, 2012. On October 10, 2012, Jennifer filed a response to Josh's motion for modification, seeking to have it dismissed for lack of factual specificity "or, in the alternative, . . . for a more definite statement or for [a] continuance to conduct discovery." Five days later, on October 15, 2012, the chancellor denied Jennifer's motion for a continuance but did not order Josh to give her a more definite statement as to his allegation that a material change in circumstances adverse to Delaney had occurred.

¶32. On November 28, 2012, Josh filed a motion pursuant to Rule 34 of the Mississippi Rules of Civil Procedure, seeking permission to enter on Jennifer's residential premises "for the purposes of inspecti[ng] and photographing the said premises and curtilage thereof, as provided for in said [r]ule." On this point, I note that the Mississippi Rules of Civil

14

Procedure have limited applicability to proceedings brought under Title 93 of the Mississippi Code of 1972. M.R.C.P. 91. More specifically, it appears to me that an action to modify custody is governed by Rule 81(d), and nothing in Rule 81(d) permits a Rule 34 inspection of the home and surroundings of a minor child in a custody dispute. *See* M.R.C.P. 81(d).

¶33. On February 26, 2013, the chancellor issued an order authorizing Madeline Richmond to perform a Rule 34 inspection of Jennifer's "residence and surrounding lands" and "to make a written report back to the [c]ourt." On May 20, 2013, the chancellor amended its Rule 34-inspection order to substitute Heather M. Aby for Richmond. Aby was also instructed to make a written report to the court, and Josh was ordered to pay the cost for Aby's report. It is important that Aby was not appointed as a GAL and was not given any directions by the chancellor as to what the report should address, although the record reflects that the chancellor heavily relied upon the photographs that Aby took in finding that Delaney lived for approximately a year in a "squallerly [sic] and dangerous, shocking environment provided for [her] by [Jennifer]."

¶34. Before discussing the issue and the substantive facts, I need to address Josh's argument that Jennifer's sole issue—that the chancellor erred in failing to appoint a GAL since there were allegations of neglect—is procedurally barred. He points to Jennifer's timely filed motion for reconsideration and then notes that Jennifer filed a supplemental motion for reconsideration sixty-seven days after filing the original motion, raising for the first time the issue of the chancellor's failure to appoint a GAL. Josh further argues that the issue raised in the supplemental motion for reconsideration was untimely and, as such, should

15

not be considered on appeal. However, it is clear that the chancellor had not ruled on the original motion for reconsideration at the time of the filing of the supplemental motion.

¶35. A motion for reconsideration is treated as a motion to amend the judgment and must be filed within ten days from the entry of the judgment sought to be amended. *See* M.R.C.P. 59(e). Here, there is no debate that Jennifer timely filed a motion for reconsideration. The supplemental motion filed after the expiration of the ten-day period introduced a new argument. However, Josh did not object at the time that it was filed in the chancery court. In addition, the chancellor's final order overruling and dismissing the motion for reconsideration refers to the supplemental motion. In effect, the supplemental motion was treated as an amended motion, which consolidated the issues and was ruled upon accordingly. Therefore, I find that Jennifer's issue here is procedurally alive and is properly before us.

¶36. After carrying out what has been called "the inspection," Aby submitted her findings to the court, but those findings were nothing more than a collection of photographs and a one-page statement. In the statement, Aby wrote:

> On May 31, 2013, [I] inspected the property pursuant to the order of the court. Jennifer Carter is residing in a one[-]bedroom mobile home that was once used as an auto[-]repair shop by her family, namely, TnT Auto Repair. The yard surrounding the mobile home was not a safe place for a child[,] with car parts, trash, dirty blankets, bottles, old appliances, [and] pipes lying around. The grass also needed cutting. The inside of the trailer was also generally not safe for a minor child[,] with water leaks[,] mold, dirty clothes, dirty and clean dishes everywhere, [and] no air conditioner running. Numerous pictures were taken of the inside and outside of the mobile home[,] which is structurally unsound and in a state of disrepair to the point of Jennifer . . . placing tires on the roof to keep the roof from rising during strong weather.

16

Pictures were also taken of what Jennifer Carter considered a "cabin;" however, this is nothing more than a wooden shed with only one entrance. There is no secondary exit in the event of a fire. Pictures have also been taken of this shed.

The pictures taken by the [GAL] speak for themselves. In *Riley v. Doerner*, 677 So. 2d 740 (Miss. 1996), the Mississippi Supreme Court found "a chancellor is bound to consider the child's best interest above all else."

The residence nor the wooden shed are suitable homes for the minor child at issue in the above-referenced matter.

¶37. Despite Aby's self-designation as a GAL in her report, she testified that she was not appointed as a GAL in the instant case. She stated that she believed Jennifer's mobile home was once a trailer for an auto-repair shop. She testified that she saw a tire holding down a tarp on the roof of Jennifer's one-bedroom mobile home. Aby also stated that there was an old sink, some old appliances, an old fan blade, and an old toddler bed in the yard and that there was a "good bit of garbage . . . as well as grownup weeds" surrounding the mobile home. She opined that "[i]t's very unkempt—what [she] would consider unsafe for . . . a six-year-old [child]." She questioned whether there was mold in areas where there was visible water damage. Aby further stated that there were exposed light fixtures and wires. Aby commented on the dishes in the sink and clothes in the bathtub, and she believed the mobile home was uninhabitable due to the water leaks. She pointed out that Jennifer explained to her that the roof may come off, and, as a result, Aby was "afraid for a minor child to be there."

¶38. On cross-examination, it became clear that much of what Aby had put in her so-called report and what she testified to on direct examination was overstated if not outright false.

17

For example, Aby stated that she was not aware that the auto-parts store that Jennifer's family owned had never been on the property where the mobile home is located. Aby agreed that the trailer did not seem to be an auto-repair shop, but she opined that it could have been an office. She further recalled that Jennifer said the clothes were as strewed as they were because Jennifer had not had a chance to hang them on the line and that Jennifer did not have a washing machine or dryer. Aby confirmed that the dishes were clean and that Jennifer did not have a dishwasher. Aby agreed that Delaney's room is bigger than what the photo submitted into evidence depicts. She also agreed that there was a lot of food in the refrigerator and in the pantry. Aby further agreed that the lawn seemed to have been cut at some point and that she was not aware that the referenced toddler bed was often used as a flower-garden prop. She also confirmed that the mobile home did not have signs of roaches, bugs, or rats and that it was just messy.

¶39. During further cross-examination, Aby admitted that she had not been able to go inside the cabin that Jennifer was building because she had issues with lifting her leg. Instead, her husband went inside and took the pictures that she relied on to make her evaluation of the cabin. She agreed that the piping, wiring, and insulation depicted in the pictures were preparations for a residence.

¶40. Mississippi Code Annotated section 93-5-23 (Rev. 2014) states, in pertinent part:

> The court may investigate, hear[,] and make a determination in a custody action when a *charge of abuse and/or neglect arises in the course of a custody action* as provided in [Mississippi Code Annotated] [s]ection 43-21-151 [(Supp. 2014)], and in such cases the court *shall appoint a guardian ad litem* for the child as provided under [Mississippi Code Annotated] [s]ection 43-21-121 (Rev. 2009), who shall be an attorney.

18

(Emphasis added).

¶41.   Although not alleged on the face of his motion for modification, during the hearing, Josh emphasized the issue of neglect and its alleged effect on Delaney's "failure-to-thrive" status.  In addition, the Rule 34 search of the premises requested by Josh was indicative of his belief that Delaney was being neglected by Jennifer.  It is disingenuous to suggest that since the motion did not allege neglect, there was no need to appoint a GAL.  Furthermore, the chancellor confirmed in his bench opinion that Josh "allege[s] in part that Delaney was not being properly cared for . . . and express[es] additional concerns."  As stated, the chancellor took note of the "squallerly [sic] and dangerous, shocking environment provided for the child by the mother over an extended period of time of approximately one year."  Even Josh admits on appeal that issues of neglect arose during the hearing.

¶42.   "In child-custody cases where there are allegations of abuse or neglect, courts must appoint a guardian." *Borden v. Borden*, 167 So. 3d 238, 243 (¶11) (Miss. 2014).  Failure to appoint a GAL, when it is mandatory, constitutes reversible error. *See Heffner v. Rensink*, 938 So. 2d 917, 920 (¶10) (Miss. Ct. App. 2006).  Although *Heffner* dealt with an action to terminate parental rights, I find that the law also mandates the appointment of a GAL when allegations of neglect arise, and, as such, it is reversible error for a court to fail to appoint one in the face of allegations of neglect.  Here, without the benefit of a GAL's investigation, the chancellor was left with insufficient information about Delaney's then current situation and could not make an informed ruling.  It cannot be legitimately argued that Aby served that function.  In light of the facts that were revealed during the cross-examination of her, it is

19

clear to me that, at best, she was incompetent or, at worst, an advocate for Josh, as she made several statements that she possessed no expertise to make. For example, she stated in her report that the mobile home was structurally unsound. I do not believe the record shows that she is a structural engineer.

¶43. Section 43-21-121(3) provides:

> In addition to all other duties required by law, a [GAL] shall have the duty to protect the interest of a child for whom he has been appointed [GAL]. The [GAL] shall investigate, make recommendations to the court[,] or enter reports as necessary to hold paramount the child's best interest. The [GAL] is not an adversary party[,] and the court shall insure that [GALs] perform their duties properly and in the best interest of their wards. The [GAL] shall be a competent person who has no adverse interest to the minor. The court shall insure that the [GAL] is adequately instructed on the proper performance of his duties.

¶44. Here, as Jennifer points out, the chancellor did not have a full purview of her relationship with Delaney based only on the Rule 34 report. Further, according to Jennifer's testimony, she had moved from the mobile home at the time of the hearing. The Mississippi Supreme Court made it clear in *In re R.D.,* 658 So. 2d 1378 (Miss. 1995), that "the [GAL] is the one primarily charged with and looked to for protection of the children's interest when judicial proceedings arise." *Id.* at 1382 (citation omitted). Certainly a GAL would have thoroughly investigated factors that are fundamental in determining the best interest of a child in a modification-of-custody proceeding where issues of neglect arise: a new home, the relationship between Delaney and each parent, schools, health, age, etc. Instead, the chancellor received a limited statement regarding the conditions of the premises of Jennifer's former residence, which was a major basis for the modification of custody. I should note that

20

based on the record and the state of the pleadings at the time the Rule 34 appointment of Aby was made, it is difficult to argue that the purpose of the appointment was for a reason other than to assist Josh in gathering some evidence to support his otherwise naked allegation that a material change in circumstances had occurred. And to base a change of custody on such a one-sided report that does not even attempt to give balance, is to ignore the important role that a GAL should play in assisting a chancellor in fashioning a solution that is in the child's best interest.

¶45. In his bench opinion, the chancellor stated:

> In this case, the [c]ourt finds that [Jennifer] has moved a number of times, at least three, depending on how you count the moves, but three or four moves. And there have been numerous short-lived jobs. And over the course of that time, there has been a lack of stability proven in that home. There have been incidents, altercations; in fact, there has even been gunfire down on the property or near [Jennifer's] property resulting from either [Josh] or his private investigator wanting to take some pictures. I mean, it's not a stable situation at times.
>
> And the squallerly [sic] and dangerous, shocking environment provide[d] for [Delaney] by [Jennifer] over an extended period of time of approximately one year, during which time this child had a lot of respiratory infections, and where the child resided until close proximity in time to the first day of our trial in this case, all of these things in their totality, as well as Delaney's failure to progress while in the custody of her mother, all of these things constitute a material change of circumstances adverse to the child. Even just the living environment over that period of a year; and I reiterate, it's shocking, outrageous that any child should have to live in conditions such as that. It is a per se adverse influence to this little girl's best interest to live in that kind of environment.

¶46. With all due respect to the chancellor and the majority, there is not substantial evidence in the record to support the chancellor's inferential finding that (1) Delaney's failure to progress while in the custody of her mother, (2) Delaney's respiratory infections,

21

and (3) the environment generally where Delaney lived constituted a material change of circumstances. First, it should be noted that the medical evidence is that Delaney was born prematurely at twenty-eight weeks and weighed just two pounds and ten ounces at birth. Admittedly her growth had been slow, but that was the case prior to Jennifer and Josh's divorce, as she was first seen by Dr. George Moll, an endocrinologist at the University of Mississippi Medical Center (UMMC), on July 10, 2010, for slow-growth problems. Remember, the divorce did not take place until June 8, 2011. She was seen again on April 12, 2012, by Dr. Naznin Dixit, a pediatric endocrinologist at the UMMC. Dr. Dixit made it clear that she was just doing a normal follow-up, as is done with children who are born prematurely. Specifically, Dr. Dixit described the purpose of her consultation with Delaney "as a continuing management of her growth problems." She found no organic or nutritional causes for Delaney's slow-growth issue, explaining that it could be familial. Therefore, there is no medical evidence that the home environment described in the Rule 34 report had any connection with Delaney's failure-to-thrive status or any respiratory infections that she has had.

¶47. Second, I point out that the mobile home that is featured so prominently in the Rule 34 report was just a temporary living space while Jennifer was having the cabin built. While Aby described the cabin as a shed, she never went inside of it. Jennifer explained that the cabin is built on the style of a Jim Walters home, is clean, is reasonably spacious, and contains all of the normal home furnishings. She explained that the cabin had been inspected by the appropriate government officials and that she had a permit to occupy it, although she

22

still needed to do some painting and add some insulation beneath the floor. As stated, she and Delaney were residing in the cabin when the trial took place.

¶48. While Jennifer did not directly appeal the chancellor's judgment modifying custody, I would hold that her appeal of the chancellor's decision denying her motion to reconsider—wherein the issue of the failure to appoint a GAL was raised—is tantamount to appealing the chancellor's judgment modifying his prior custody judgment because the chancellor failed to comply with a statutorily mandated prerequisite. Therefore, in my opinion, Jennifer's failure to directly and literally appeal the modification judgment is no impediment to this Court setting it aside. I would find that the judgment is subject to attack on appeal because the chancellor did not appoint a GAL in the face of allegations of neglect.[5] Consequently, I would reverse the judgment of the chancery court and remand this case to the active docket of the chancery court for a determination—with input from a properly appointed GAL—of whether a change of custody is warranted.

¶49. For the reasons stated, I would reverse and remand the judgment of the chancery court. Therefore, it is not necessary that I engage in a lengthy discussion of the issue of due process that I mentioned at the beginning of this dissent. First, it is enough to say that Josh's motion for modification of custody failed to inform Jennifer of the material changes that warranted a change of custody. Second, it appears that at the time Josh filed his motion,

---

[5] Although not raised here or in the court below, I point out that there appears to be a serious question as to whether the chancellor even had jurisdiction to hear the motion for modification because the record shows that the hearing was not held on the date specified in the Rule 81 summons but does not show that an order was entered on that date continuing the matter until the day it was finally heard. *See* M.R.C.P. 81(d)(5).

23

there were no such changes and that Josh waited until six days before the hearing to begin a quest to drum up some evidence to support the allegation that he had made approximately five months earlier. Of course, by this time, Jennifer and Delaney had resided in their new residence in Lumberton for approximately five months, enough time for Josh to allege that Delaney was living in very poor conditions. Third, the chancery court, for whatever reasons, refused to order Josh to give Jennifer a more definite statement regarding the allegations that he had made. Given that notice pleading is sufficient to begin an adversary process, it seems to me that rudimentary fairness would dictate that a party who has filed only a notice pleading would—upon proper application to the court by the respondent—be required to supply the alleged facts supporting the allegations in his pleading. Fourth and final, it seems to me that Jennifer was ambushed and punished for moving away from Brandon, Mississippi.

¶50. As an additional observation—though not relevant to the disposition of the issue before us—I note that Jennifer was not awarded use and possession of the marital home when she and Josh were divorced, yet the chancery court awarded her custody of Delaney. Although the record before us does not reveal Jennifer's pre-divorce financial condition, it appears that she may have been without the financial means at the time of the divorce to provide a home for Delaney that was equivalent to the marital domicile that Delaney was apparently accustomed to. On this point, I note that in his opinion modifying custody, the chancellor stated:

> Now, since the [f]inal [j]udgment of [d]ivorce, Jennifer has moved to Lumberton in Lamar County, some two hours' drive away. And presently her vocation is driving a school bus for the local school district, and she brings home some $840 a month. She is also in school at a community college,

24

taking some online courses. Her only income is that $840, plus the child support that she receives from [Josh] each month, and some small amount of public assistance, some $19 in food stamps that she receive[s]. She has a hard time financially and still owes some debts, or did at the time of trial. . . . She has had a difficult financial go of it since the [f]inal [j]udgment of [d]ivorce.

At the present time, she lives in what has been described as a cabin on family property near her mother and stepfather in Lamar County.

Josh, on the other hand, continues to reside in the city of Brandon at the former marital home, and I looked back at the [f]inal [j]udgment, that's Lot 12, Pecan Ridge West, Part 1, here in the city of Brandon.

¶51. It may very well have been in Delaney's best interest for her custody to have been transferred to her father, but I cannot find that Jennifer was accorded the appropriate due process or that the chancellor followed well-established law regarding the prerequisites that must be met before a transfer may be made. Therefore, I respectfully dissent.