# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-01340-COA

AMARIA VASSAR                                                                          APPELLANT

v.

DAVID VASSAR                                                                            APPELLEE

DATE OF JUDGMENT:               07/01/2016
TRIAL JUDGE:                    HON. PERCY L. LYNCHARD JR.
COURT FROM WHICH APPEALED:      DESOTO COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:         JERRY WESLEY HISAW
ATTORNEY FOR APPELLEE:          DAVID VASSAR (PRO SE)
NATURE OF THE CASE:             CIVIL - DOMESTIC RELATIONS
DISPOSITION:                    AFFIRMED IN PART; REVERSED AND
                                REMANDED IN PART - 10/17/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**WILSON, J., FOR THE COURT:**

¶1.     David and Amaria Vassar consented to an irreconcilable differences divorce and submitted several issues to the chancellor for decision: custody of their son, Martin,[1] who was three years old at the time of the divorce; child support; equitable division of the marital property; alimony; attorney's fees; and contempt.   On appeal, Amaria argues that the chancellor erred (1) by awarding David custody of Martin, (2) in dividing the marital estate, (3) in awarding David permanent alimony, (4) in awarding David attorney's fees, (5) in setting child support, and (6) in ordering her to be incarcerated for contempt.

---

[1] The child's name is changed to protect his privacy.

¶2.     We affirm on the issue of custody but reverse on the issues of equitable division, child support, alimony, and attorney's fees. As discussed below, the sum total of the obligations that the divorce decree imposed on Amaria were beyond her ability to pay. In addition, the chancellor set child support based on an incorrect income figure and did not make findings under *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994), to support the division of the marital property. The chancellor also erred in awarding attorney's fees, as the record shows that Amaria was unable to pay. The chancellor could have ordered Amaria to pay the substantially lesser amount of attorney's fees that David incurred litigating the issue of contempt. Finally, we hold that the chancellor erred by ordering Amaria to be incarcerated, as she was unable to pay the nearly $13,000 mortgage arrearage that she was ordered to pay as a condition of her release. The chancellor released Amaria from jail forty-seven days later, after she filed for bankruptcy, but we address this issue under the "capable of repetition yet evading review" exception to the mootness doctrine.

**FACTS**

¶3.     David and Amaria married on November 8, 2007. Their son, Martin, was born in 2013. They separated around April 30, 2015. Amaria filed for divorce on the grounds of habitual cruel and inhuman treatment and/or irreconcilable differences in May 2015, and David answered and filed a counter-complaint for divorce on the same grounds several weeks later. Both Amaria and David sought custody of Martin, and David alleged that Amaria had abused or neglected Martin. The chancellor entered a temporary order granting

2

David custody of Martin and granting Amaria specified visitation. The chancellor also appointed a guardian ad litem (GAL) to investigate David's allegations of abuse and neglect. Finally, the chancellor granted David temporary possession of the marital home but ordered Amaria to continue to pay the mortgage and utilities.

¶4. The case was not tried until July 1, 2016. About a month before trial, David filed a petition for contempt alleging that Amaria had stopped paying the mortgage and disconnected the utilities on the marital home in violation of the temporary order. On the day of trial, the parties consented to an irreconcilable differences divorce, while submitting the issues of child custody, child support, property division, alimony, attorney's fees, and contempt to the chancellor for decision.

¶5. Amaria and David own a house in DeSoto County, which they purchased in 2009. The original purchase price of the home was approximately $170,000, but they later refinanced the home for approximately $198,000. At the time of trial, the mortgage balance was approximately $185,000, including nearly $13,000 in arrearages. Only Amaria is obligated on the promissory note, apparently because of David's poor credit history.

¶6. Amaria is a Captain in the United States Army Reserve (USAR) and attends drills one weekend a month and training for two weeks in the summer. When she filed for divorce, she was also employed as a medical laboratory technician. Her average, combined net income for her service in the USAR and employment as a lab tech was $3,034.52 per month.

¶7. In April 2015, David filed an affidavit to have Amaria civilly committed. David

3

alleged that Amaria was depressed and might not be taking her psychiatric medications. David also alleged that Amaria was suicidal and had threatened him.

¶8.     Based on David's affidavit, Amaria was committed to a mental health facility for approximately ten days. She was released after her doctors concluded that she was not a risk to herself or others and did not require treatment. Amaria eventually lost her job as a lab tech, at least in part because she missed work as a result of her commitment.

¶9.     Amaria testified that after she lost her job, she was unable to pay both her own rent and living expenses and the mortgage note and utilities on the marital home. At trial, she admitted that, without court approval, she simply stopped paying the mortgage and had the utilities disconnected.

¶10.    Amaria eventually found a new job as a sales consultant at Gossett Motor Cars, where she was still employed at the time of trial. At Gossett, she is paid only minimum wage plus commissions, which has resulted in a substantial reduction in her overall net income. Amaria's Rule 8.05 financial statement showed $2,208.19 as her total monthly net income. On cross-examination, Amaria acknowledged that she also receives $133 per month for an injury she suffered during an overseas deployment, which was not reflected on her 8.05 statement. Amaria testified that she would like to return to full-time military service and would do so if given the opportunity.

¶11.    David also served in the military at one time, but he had been unemployed for all but about one year of the parties' marriage. He last worked for about a month in 2014 before he

4

was injured and received workers' compensation payments for one year. At the time of trial, he had not worked in over two years and had two pending disability claims. One of the claims had been pending for four years and the other for two years. David did not produce any medical records or documentation regarding his injuries or disability claims.

¶12. David testified that a back injury prevents him from doing any work that involves heavy lifting or "standing up for a long time." Also, he "can't do a desk job" because he is "prohibited" from "sitting down for certain amounts of time." A doctor supposedly advised David against doing even "paperwork." However, David did testify that he is physically capable of caring for Martin because he can "teach [Martin] what's the perimeter," and three-year-old Martin "follows [his] command" and "stays within those perimeters." Amaria testified that there is "nothing medically wrong with" David that prevents him from working, and he just "does not want to work." The GAL's report noted that David pays $300 per month in child support for a teenage daughter from a prior relationship.

¶13. As noted above, Martin was three years old at the time of trial. The GAL found that Martin was a happy and physically and mentally healthy child. The GAL found no evidence to substantiate David's allegations of neglect and abuse. The GAL also found that Martin had an emotional connection and was "equally comfortable with both" of his parents. In her report, the GAL discussed the *Albright*[2] factors and opined that two factors favored David, two favored Amaria, and the rest were neutral or inapplicable. The GAL recommended that

---

[2] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

David be given custody of Martin.

¶14. David and Amaria accused each other of acts of physical and verbal abuse. Amaria testified about three incidents in which David choked her, grabbed her, and pushed her off their porch. The police were called and responded to these incidents, but none resulted in charges. On May 7, 2015, a special master of the chancery court entered a temporary domestic abuse protection order that prohibited David from making contact with Amaria other than during visitation exchanges. The order stated that it would expire on May 21, 2015. Amaria also testified that David verbally abused her, falsely accused her of abusing and neglecting Martin, and filed a false affidavit to have her committed. She testified that she was receiving counseling for depression, which she attributed to David's abuse.

¶15. David testified that Amaria had threatened him with a meat cleaver or a machete on multiple occasions. He testified that she cut him with a knife once. That incident apparently resulted in a charge of simple assault against Amaria and some sort of nonadjudication or suspended sentence. David also testified that Amaria had received treatment and counseling for mental health issues, although he denied that he was to blame for her issues.

¶16. The chancellor conducted an *Albright* analysis on the record and agreed with the GAL's recommendation that David should have custody. The chancellor awarded Amaria visitation every other weekend plus holidays and five weeks in the summer. The chancellor also ordered Amaria to pay David $443 per month in child support and to maintain health insurance for Martin.

¶17. In dividing the marital property, the chancellor awarded David the exclusive use and possession of the marital home until Martin reached the age of twenty-one or was otherwise emancipated. As part of the "equitable division of [the marital] property," the chancellor ordered each party to pay one half of the mortgage, insurance, and taxes on the home, which was $638 per month. However, the chancellor then ordered Amaria to pay David's half for him, which the chancellor characterized "periodic alimony" of $638 per month. Thus, the decree ordered Amaria to pay the full monthly mortgage payment of $1,276 per month.

¶18. The chancellor also ordered Amaria to pay David's attorney's fees in the amount of $10,058.25. The chancellor ordered Amaria to pay $1,462.50 within ten days and the remaining balance within ninety days.

¶19. Finally, the chancellor found that Amaria was in contempt because she willfully violated the July 2015 temporary order by ceasing to pay the mortgage and disconnecting the utilities on the marital home. The chancellor ordered Amaria to be incarcerated immediately and to remain in jail until she purged herself of contempt by paying $12,997.65, the amount of the arrearage on the mortgage. The chancellor stated that he would "review this matter every 90 days until such time as it is paid."

¶20. Six days later, on July 7, 2016, Amaria filed a motion to alter the judgment and for release from incarceration, arguing that the evidence at trial showed that she was unable to pay the nearly $13,000 mortgage arrearage. Amaria then obtained new counsel, and on July 27 she filed a second motion requesting release from incarceration. She again argued that

7

she was unable to pay the arrearage, and she also submitted documentation showing that she had been ordered to report for military training on August 6. On August 10, Amaria filed a petition for bankruptcy in bankruptcy court and a notice of bankruptcy in the chancery court. On August 17, the chancellor ordered her released after forty-seven days in jail.

¶21. The court subsequently entered an order denying Amaria's post-trial motions. The court's order clarified that the marital home should be sold once Martin reached the age of twenty-one or was otherwise emancipated and that any "equity" in the home would then be "split between the parties." The order also awarded David the federal and state income tax deduction for Martin. Amaria filed a timely notice of appeal and a thorough brief, supported by relevant authorities and record citations, addressing the six issues noted in the opening paragraph of this opinion. David failed to file a brief despite a show-cause notice pursuant to Rule 2 of the Mississippi Rules of Appellate Procedure.

## DISCUSSION

¶22. David's "failure . . . to file a brief is tantamount to confession of error and will be accepted as such unless [this Court] can say with confidence, after considering the record and [Amaria's] brief . . . , that there was no error." *Rogillio v. Rogillio*, 101 So. 3d 150, 153 (¶12) (Miss. 2012) (quotation marks omitted). "Automatic reversal is not required where the appellee fails to file a brief," but reversal is appropriate if the appellant's argument creates "doubt in the judiciousness of the trial court's judgment." *Id.* However, when "child custody is at issue, this Court is compelled to review the record, despite [David's] failure to file a

8

brief . . . ." *Muhammad v. Muhammad*, 622 So. 2d 1239, 1243 (Miss. 1993).

¶23. "A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous." *Sanderson v. Sanderson*, 824 So. 2d 623, 625 (¶8) (Miss. 2002). "Legal questions, however, are reviewed de novo." *Sanford v. Sanford*, 124 So. 3d 647, 652-53 (¶21) (Miss. 2013).

## I.    Child Custody

¶24. "A chancellor's custody decision will be reversed only if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard." *Smith v. Smith*, 97 So. 3d 43, 46 (¶7) (Miss. 2012). "[T]his Court cannot reweigh the evidence and must defer to the chancellor's findings of the facts, so long as they are supported by substantial evidence." *Hall v. Hall*, 134 So. 3d 822, 828 (¶21) (Miss. Ct. App. 2014). Thus, on appeal in a child custody case, the issue is not whether this Court "agrees with the chancellor's ruling," but only whether "the chancellor's ruling is supported by credible evidence." *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004).

¶25. "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005. In evaluating the child's best interest, the chancellor must consider the following factors: (1) age, health, and sex of the child; (2) which parent had "continuity of care prior to the separation"; (3) "which has the best parenting skills"; (4) which has "the willingness and capacity to provide primary child care"; (5) both parents' employment responsibilities; (6) "physical and mental health and age of the

parents"; (7) "emotional ties of parent and child"; (8) "moral fitness of the parents"; (9) the

"home, school and community records of the child"; (10) the child's preference, if the child

is at least twelve years old; (11) the stability of the home environment and employment of

each parent; and (12) any "other factors relevant to the parent-child relationship" or the

child's best interest. *Id.*

¶26. The chancellor must address each *Albright* factor that is applicable to the case. *See*

*Powell v. Ayars*, 792 So. 2d 240, 244 (¶10) (Miss. 2001). However, the chancellor need not

decide that each factor favors one parent or the other. *See Weeks v. Weeks*, 989 So. 2d 408,

411 (¶12) (Miss. Ct. App. 2008). Nor does *Albright* require that "custody must be awarded

to the parent who 'wins' the most factors." *Blakely v. Blakely*, 88 So. 3d 798, 803 (¶17)

(Miss. Ct. App. 2012). The point of *Albright* is to identify the custody arrangement that

would be in *the child's* best interest—not to determine what is in either parent's best interest

or which parent is the better person.[3]

¶27. The *Albright* factors are intended to ensure that the chancellor follows a process that

leads to consideration of all facts that are relevant to the child's best interest. "All the factors

are important, but the chancellor has the ultimate discretion to weigh the evidence the way

he sees fit." *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003).

---

[3] *See Reno v. Reno*, 253 Miss. 465, 475, 176 So. 2d 58, 62 (1965) ("The relationship of parent and child is not for the benefit of the parent, but of the child." (quoting J.W. Bunkley Jr. & W.E. Morse, *Amis on Divorce and Separation in Mississippi* § 8.01 (2d ed. 1957)); *see also Hollon v. Hollon*, 784 So. 2d 943, 947 (¶12) (Miss. 2001) ("[M]arital fault should not be used as a sanction in custody awards.").

¶28. In this case, the chancellor discussed each of the *Albright* factors. He found that the sex of the child, continuity of care, willingness to provide care, and parenting skills favored David. He found that Martin's age and Amaria's stable employment record weighed in favor of Amaria—he commended her consistent employment and criticized David's employment record as "spotty at best." The chancellor found that other factors were neutral or inapplicable. Finally, the chancellor stated that he had considered the GAL's report. Although his analysis differed from the GAL's on some factors, he agreed with her recommendation that David should have physical and legal custody of Martin, with liberal visitation for Amaria.

¶29. Amaria argues that the chancellor erred because he failed to consider the "rebuttable presumption that it is detrimental to the child and not in the best interest of the child to be placed in [the] sole custody . . . of a parent who has a history of perpetrating family violence." Miss. Code Ann. § 93-5-24(9)(a)(i) (Rev. 2013). She also argues that the chancellor gave insufficient weight to her allegations that David physically and verbally abused her. Finally, she argues that the chancellor's *Albright* analysis was flawed because it rewarded David under multiple factors for his unemployment—crediting his availability to provide care, "continuity of care," and demonstrated parenting skills. This, she says, is unfair because it penalizes her for providing for her family and serving in the military. We address these arguments in turn.

¶30. In the trial court, neither party argued that the statutory "rebuttable presumption"

11

applied. The statute defines "a history of perpetrating family violence" as at least one incident that "resulted in serious bodily injury" or a "pattern of family violence." *Id.* Here, each party accused the other of abuse, but each also denied the other's allegations. None of the incidents about which Amaria testified resulted in charges against David, and David disputed Amaria's versions of those incidents. In addition, Amaria did not testify that any of the incidents resulted in a serious bodily injury. *Cf. Wolfe v. State*, 743 So. 2d 380, 384-85 (¶¶21-24) (Miss. 1999) (discussing the definitions of "serious bodily injury" in aggravated assault and felony child abuse cases). Without condoning violence by either party, if any occurred, we cannot say that the statute applied in light of the conflicting testimony and inconclusive evidence at trial.[4]

¶31. For the same reason, we cannot agree with Amaria's argument that the chancellor gave insufficient weight to her allegations of abuse. In his *Albright* analysis, the chancellor found that both parties were to blame for their "severe arguments, sometimes resulting in assaults." For this reason, the chancellor found that the "moral fitness" factor did not favor either party. We cannot say that this was clear error or an abuse of discretion. *See Powell*, 792 So. 2d at 243 (¶6) ("It is for the chancellor to determine the credibility and weight of

---

[4] *See Jones v. Brown*, 154 So. 3d 919, 924 (¶¶15-17) (Miss. Ct. App. 2015) (finding no reversible error given that the appellant failed to raise the issue in the trial court and that each parent denied the other's allegations of violence); *Rolison v. Rolison*, 105 So. 3d 1136, 1138-39 (¶¶8-11) (Miss. Ct. App. 2012) (holding that the chancellor did not err by not applying the presumption when "[b]oth parents admitted to behaving aggressively" and there was no proof that either inflicted "any serious injury"); *C.W.L. v. R.A.*, 919 So. 2d 267, 271-72 (¶¶12-17) (Miss. Ct. App. 2005) (similar).

evidence.").

¶32. Finally, we cannot say that the chancellor committed reversible error in his *Albright* analysis by giving David excessive credit for his unemployment. The chancellor specifically commended Amaria for her consistent employment, he criticized David's work history as "spotty at best," and he weighed that factor in Amaria's favor. The chancellor did weigh other factors in David's favor based on David's unemployment and consequent availability to provide childcare. We understand how this may seem to unfairly penalize Amaria for holding down a job, providing for her son, and serving her country in the military. However, as discussed above, the chancellor's duty is to determine which custody arrangement is in the child's best interest—not to determine which parent is a better person. The chancellor reasonably considered David's greater availability to provide childcare as part of this analysis, and we cannot say that he abused his discretion by doing so.

¶33. In summary, applying our deferential standard of review, *see supra* ¶¶23-24, we find no abuse of discretion in the chancellor's *Albright* analysis and custody ruling.

## II. Child Support, Equitable Division, Alimony, and Attorney's Fees

¶34. Amaria argues that the chancellor erred in setting child support, dividing the marital property, and awarding alimony and attorney's fees. She alleges specific errors with these awards and also argues generally that they are beyond her ability to pay. We address these issues and arguments together, as it is necessary to consider the cumulative financial burden that the divorce decree imposed.

13

¶35.   Amaria's average net monthly income at the time of the divorce was $2,341.19.[5]  Her assets and liabilities included a 2004 Chevy Tahoe, a checking account with a balance of about $1,000, and credit card debt of nearly $4,000.  The divorce decree required her to make the following payments:

- $443/month child support;

- $638/month for half of the mortgage payment on the marital home;

- $638/month periodic alimony (David's half of the mortgage payment);

- $12,997.65 in mortgage arrearages (due immediately); and

- $10,058.25 in attorney's fees ($1,462.50 due in ten days, with the balance due in ninety days).

¶36.   As discussed above, the chancellor granted David exclusive use and possession of the marital home until Martin, who was only three years old at the time of the divorce, reaches the age of twenty-one or is otherwise emancipated.  Nonetheless, the decree requires Amaria to continue making the entire mortgage payment of $1,276 per month—half as part of the "equitable division" of the marital property and half as "periodic alimony."  In addition to the sums listed above, the court also ordered Amaria to provide health insurance for Martin. Thus, although Amaria had no significant assets and a net monthly income of only $2,341.19, the court ordered her to make total monthly payments of $1,719, maintain health insurance

_____

[5] As noted above, Amaria's Rule 8.05 financial statement showed $2,208.19 as her total monthly net income from Gossett and her USAR service, but on cross-examination she acknowledged that she received an additional $133 per month for an injury she suffered during an overseas deployment, which her 8.05 statement did not reflect.

for Martin, and pay more than $23,000 in mortgage arrearages and attorney's fees.

¶37.    The financial aspects of the divorce decree must be reversed because the various obligations imposed on Amaria simply do not leave her with sufficient resources to meet her own reasonable living expenses.  Before we address this broader issue, however, we first address two narrower issues with the chancellor's ruling that also require reversal.

¶38.    First, Amaria argues that the chancellor erred by using an incorrect income figure to calculate child support.  We agree.  "In determining child support, chancellors may consider, inter alia, the health, income, and earning capacity of both parents, the reasonable needs of the child, and the necessary living expenses of the noncustodial parent."  *Barnes v. Dep't of Human Servs.*, 42 So. 3d 10, 18 (¶32) (Miss. 2010) (Waller, C.J., concurring in part and in result).  There is a rebuttable presumption that a parent should pay fourteen percent of his or her adjusted gross income for the support of one child.  Miss. Code Ann. § 43-19-101(1) (Rev. 2015).

¶39.    In this case, in ruling from the bench, the chancellor stated that Amaria's "current net income from all sources, including Gossett[], her military pay, and disability payments for her injury to her foot while deployed overseas, totaled $3,167.42 per month."  He then ordered Amaria to pay support of fourteen percent of that amount—$443 per month.  As Amaria points out on appeal, the chancellor's ruling was based on a mistake—her actual net income at the time of the divorce was only $2,341.19, as she was earning far less at Gossett

15

than she had at her prior job as a medical laboratory technician.[6]  Because the chancellor's

calculation of child support was based on a "clear mathematical error," we must reverse.

*Jackson v. Jackson*, 172 So. 3d 179, 181 (¶9) (Miss. 2015).

¶40.    Second, Amaria argues that the chancellor's equitable division of the marital property

must be reversed because the chancellor made no findings of fact or conclusions of law

regarding the *Ferguson* factors.  *See Ferguson*, 639 So. 2d at 928.  We agree.  "In applying

the *Ferguson* factors, chancellors must support their decisions with findings of fact and

conclusions of law."  *Dickerson v. Dickerson*, 34 So. 3d 637, 644 (¶24) (Miss. Ct. App.

2010).  "While chancellors need not make findings as to each and every factor set forth in

*Ferguson*, they cannot simply mention the guidelines and state they are following them and

applying them to the facts of the case."  *Lee v. Lee*, 78 So. 3d 326, 329 (¶10) (Miss. 2012)

(footnote, quotation marks omitted).  "The failure to make findings of fact and conclusions

of law is manifest error requiring reversal and remand."  *Id*. (quotation marks omitted).

¶41.    In the present case, the chancellor noted that "the parties have very little property."

While that is true, the chancellor's equitable division included the financially significant

requirement that Amaria continue to pay the mortgage on the marital home for up to *eighteen*

*years*—even though she would have no right to live there.  Despite the significance of this

provision, the chancellor did not address any of the *Ferguson* factors.  The divorce decree

simply recites that the property division was based on a "full review" of the *Ferguson* factors.

---

[6] The basis for the higher income figure that the chancellor used is not clear from the record.

16

This was error and requires reversal. *Lee*, 78 So. 3d at 329 (¶10).[7]

¶42.    We now return to the larger problem with the financial components of the divorce decree: it imposes obligations that are beyond Amaria's ability to pay. It requires Amaria to make monthly mortgage and child support payments of $1,719, which, on her income at the time of the divorce, left her with only $622 per month to provide health insurance for Martin and pay her own rent and living expenses. At the time of trial, Amaria was paying rent of $600 per month, and her 8.05 statement listed over $1,000 per month in additional living expenses. Furthermore, although Amaria had no significant assets, the chancellor ordered her to pay the $12,997.65 mortgage arrearage immediately, $1,462.50 in attorney's fees within ten days, and an additional $8,595.75 in attorney's fees within ninety days. The decree does not leave Amaria with sufficient income to pay her own reasonable living expenses. Nor was there any realistic way for Amaria to make the more than $23,000 in lump sum payments required by the decree.

¶43.    A court cannot impose support obligations on a parent that are "beyond [her] financial ability to provide." *Adams v. Adams*, 467 So. 2d 211, 215 (Miss. 1985). Moreover, a chancellor should not award alimony that, when combined with child support and the payor's own reasonable living expenses, is beyond the payor's ability to pay. *McEachern v.*

_____

[7] Property division and alimony are "intertwined" such that a reversal and remand for reconsideration of the former ordinarily requires reconsideration of the latter as well. *See McKissack v. McKissack*, 45 So. 3d 716, 723-24 (¶¶41-43) (Miss. Ct. App. 2010). In any event, in this case the alimony award must be reversed for reconsideration for the additional reasons discussed below.

17

*McEachern*, 605 So. 2d 809, 814-15 (Miss. 1992); *see also Brooks v. Fields*, 134 So. 3d 786, 790-91 (¶¶15-17) (Miss. Ct. App. 2013) (holding that it was an abuse of discretion to order a parent to make a $15,000 lump sum payment when "there was no evidence that [the parent] had [the necessary] disposable income or cash on hand at the time the chancellor ordered the payment"). In this case, the financial provisions of the divorce decree violate these principles by imposing obligations that Amaria cannot possibly satisfy and by leaving her with insufficient income to meet her own reasonable living expenses. Therefore, the property division and alimony are reversed. On remand, the alimony, if any, and any payments associated with the division of marital property must be within Amaria's ability to pay.

¶44. At trial, Amaria specifically requested that the marital home be sold. Based on evidence presented and the parties' circumstances at the time of trial, we agree that there was no sustainable financial solution that did not include selling the home. Because of David's extended unemployment, Amaria's limited income was the only income available to support her, Martin, and David at the time of the divorce.[8] A net income of $2,341.19 per month is not enough to pay a $1,276 mortgage, child support, and Amaria's own living expenses. On remand, unless the parties' financial situation has improved significantly or some other solution is identified, it will likely be necessary to sell the home.[9]

---

[8] David's 8.05 statement reported $0 income.

[9] At this point, the mortgage and arrearage are primarily an issue between Amaria and the bank, as David is not obligated on the note. It has now been more than a year since the divorce decree was entered, and we do not know the current status of the mortgage. On remand, the divorce decree should not order Amaria to make payments toward the mortgage

18

¶45. Finally, we also reverse the award of attorney's fees because it is beyond Amaria's ability to pay. "Where neither party is able to pay more than his or her own fees, an award of attorney's fees is inappropriate." *Evans v. Evans*, 75 So. 3d 1083, 1089 (¶24) (Miss. Ct. App. 2011) (citing *Sarver v. Sarver*, 687 So. 2d 749, 755 (Miss. 1997), *overruled on other grounds by Pearson v. Pearson*, 761 So. 2d 157 (Miss. 2000)); *see also, e.g.*, *Farris v. Farris*, 202 So. 3d 223, 236 (¶50) (Miss. Ct. App. 2016) ("[I]f *neither* party has the ability to pay more than his or her own fees, no fees should be awarded."). For the reasons already discussed, the evidence at trial was clear that Amaria was unable to pay $10,058.25 in attorney's fees.[10] Therefore, the award of attorney's fees is reversed.

¶46. On remand, the chancellor may consider whether a lesser award of fees based on Amaria's contempt would be appropriate.[11] However, only a fraction of the fees that David requested relate to the issue of contempt, and fees awarded based on a finding of contempt "should not exceed the expense incurred as a result of the contemptuous conduct." *Roberts*

---

arrearage that are beyond her ability to pay. *Adams*, 467 So. 2d at 215.

[10] The chancellor initially ordered Amaria to pay David $13,020.75—the total of all fees charged by David's attorney. The chancellor then offset the award by the amount of the GAL's fees ($2,962.50), since the GAL determined that David's "allegations of abuse were found to be without merit." The chancellor ordered Amaria to pay $1,462.50 within ten days. This was the balance due to the GAL, which David was ordered to remit to the GAL. The chancellor ordered Amaria to pay the remaining balance of David's attorney's fees ($8,595.75) to David's attorney within ninety days.

[11] In the divorce decree, the chancellor noted that he had not addressed the issue of attorney's fees based on Amaria's contempt because he already awarded David "the entire attorney[']s fees and those for contempt [were] included therein."

19

*v. Roberts*, 110 So. 3d 820, 828 (¶23) (Miss. Ct. App. 2013) (quoting *Evans*, 75 So. 3d at 1089 n.8). Any such award should also take into account fees and costs that Amaria incurred as a result of David's allegations of abuse, which the chancellor found to be "without merit." *See supra* n.10.

### III. Incarceration

¶47. Amaria also argues that "[t]he chancellor erred in ordering [her] to be incarcerated until such time as she purged herself of contempt" by paying the nearly $13,000 mortgage arrearage on the marital home. Amaria does not contest the chancellor's finding of contempt—only the order of incarceration. Amaria is no longer incarcerated. She was released after she spent forty-seven days in jail and filed for bankruptcy. Nonetheless, she argues that we should review the issue under the "capable of repetition yet evading review" exception to the mootness doctrine. We agree that the issue is appropriate to review and that the chancellor erred by incarcerating Amaria given her clear inability to purge herself of contempt by paying the mortgage arrearage.

¶48. "Inability to pay to avoid incarceration is a continuing defense as imprisonment does not accomplish the purpose of the civil contempt decree." *Riser v. Peterson*, 566 So. 2d 210, 211 (Miss. 1990). In *Riser*, the Mississippi Supreme Court stated: "For the benefit of the bench and bar, let us attempt to state clearly that a litigant may be incarcerated for civil contempt for failure to pay a judgment but that litigant is always entitled to offer evidence of inability to pay as a defense, not to the contempt, *but to the incarceration*." *Id.* at 212

(emphasis added; capitalization omitted).

¶49. Here, Amaria concedes that she was in contempt because she violated the chancery court's temporary order requiring her to pay the mortgage and utilities on the marital home. Amaria's only argument is that she should not have been incarcerated because the record is clear that on July 1, 2016, she was unable to pay the $12,997.65 mortgage arrearage that the chancellor ordered her to pay as a condition of her release. We agree. Under *Riser*, even if inability to pay is not a defense to the underlying contempt, it is always a continuing defense to incarceration. The evidence was clear that on July 1, 2016, Amaria could not pay $12,997.65 or anything close to that amount. The chancellor therefore erred by ordering Amaria to be incarcerated until such time as she paid that amount.

¶50. Amaria's release from jail after forty-seven days arguably renders moot her challenge to her incarceration.[12] However, we may address an issue that is otherwise moot when "the following elements combine: (1) The challenged action was in its duration too short to be fully litigated prior to its cessation or expiration; and (2) There was a reasonable expectation that the same complaining party would be subject to the same action again." *Strong v. Bostick*, 420 So. 2d 1356, 1359 (Miss. 1982) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). This is known as the "capable of repetition yet evading review" exception to

---

[12] *See, e.g.*, *Lafayette Cty. Bd. of Supervisors v. Third Circuit Drug Court*, 80 So. 3d 785, 788 (¶12) (Miss. 2012) ("Generally, this Court will not adjudicate moot questions."); *see also* James L. Robertson, *Mootness*, 3 *Encyclopedia of Mississippi Law* § 19:214 (2d. ed. Jeffrey Jackson et al. eds.) ("Where the matter in controversy is a thing of the past, a fait accompli, and beyond practical judicial remedy, courts of otherwise competent jurisdiction often stay their hand on grounds the matter is moot.").

the mootness doctrine. *Id.* The United States Supreme Court has applied this exception in a case in which a father challenged his incarceration for failure to pay child support but was released before his case reached the Court. *See Turner v. Rogers*, 564 U.S. 431, 439-41 (2011); *see also Koestler v. Koestler*, 976 So. 2d 372, 379-80 (¶¶19-23) (Miss. Ct. App. 2008) (holding that an appeal from an involuntary civil commitment fit within the exception even though the individual had been discharged).

¶51.    Although the facts of *Turner* are distinguishable in some respects, we agree with Amaria that this exception to the mootness doctrine is applicable. Amaria remained in jail for forty-seven days until she was released for reasons that are not explained in the record. She was never able to comply with the originally stated condition for her release—payment of the mortgage arrearage. In addition, the final judgment imposed a series of financial obligations that were beyond her ability to pay. While we have reversed and remanded these obligations for reconsideration, it is appropriate to address the order of incarceration because it is capable of repetition in the future and could again result in a period of incarceration too short for full litigation of the issue.

## CONCLUSION

¶52.    The chancellor's award of custody to David is affirmed. The equitable division of the marital property and the awards of alimony and attorney's fees are reversed and remanded for further proceedings consistent with this opinion. In addition, we hold that the chancellor erred in ordering Amaria incarcerated, as the record is clear that she was unable to pay the

22

mortgage arrearage on the marital home.

¶53.    **AFFIRMED IN PART, AND REVERSED AND REMANDED IN PART.**

    **LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, FAIR, GREENLEE AND WESTBROOKS, JJ., CONCUR.  CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. TINDELL, J., NOT PARTICIPATING.**