# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01145-COA

**LANA L. OLSON**                                                              **APPELLANT**

**v.**

**ROBERT M. BENNETT**                                                         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/25/2017 |
| TRIAL JUDGE: | HON. SANFORD R. STECKLER |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | MICHAEL C. HESTER |
| ATTORNEY FOR APPELLEE: | REED S. BENNETT |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND RENDERED - 12/18/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WILSON, J., FOR THE COURT:**

¶1.     The issue in this appeal is whether the chancery court erred by changing the surname of a nine-year-old boy at the request of the boy's father and over the objection of the boy's mother. We agree with the mother that the chancery court manifestly erred by changing the boy's name. Therefore, we reverse and render the judgment of the chancery court to that extent.

## FACTS AND PROCEDURAL HISTORY

¶2.     Noah[1] was born in Gulfport in July 2008. Noah's father, Robert Bennett, was present

---

[1] We use a fictitious first name for the minor child.

when Noah was born, but he insisted on a paternity test and refused to sign Noah's birth certificate or be listed as Noah's father. Accordingly, Noah's birth certificate did not list a father, and Noah took the surname of his mother, Lana Olson (Lana). Within three weeks of Noah's birth, a DNA test confirmed that Bennett was Noah's father. However, Bennett took no steps to have his name added to Noah's birth certificate. Nor did Bennett pursue visitation with Noah. Noah has lived with Lana his entire life.

¶3.    Years passed. At some point, Bennett began paying child support, although the record does not reflect when Bennett began paying support or how much he paid. Otherwise, Bennett was not "in the picture."

¶4.    In April 2016, Bennett filed a "Complaint for Child Custody and Support, Amendment or Correction of Birth Certificate, and Motion for Temporary Relief" in the Harrison County Chancery Court.[2] Lana and Noah subsequently moved to Kentucky, where they live with Lana's mother, Sharon Olson (Sharon). Lana and Bennett eventually resolved all issues related to child custody and support, and in July 2017 the court entered an "Agreed Order of Custody and Support." The parties did not include the order in the record on appeal, but it apparently awarded physical custody to Lana, grants visitation to Bennett, and orders Bennett to pay child support. Bennett's visitation was described during a hearing as not "the ordinary standard visitation of every other weekend, but . . . simply . . . parcels of time for the four major holidays." Sharon stated that Bennett has visitation with Noah for a total of three months each year.

---

[2] Bennett filed an amended complaint in May 2016. However, the parties did not include the complaint, amended complaint, or any other pleading in the record on appeal.

¶5.    In July 2017, the chancery court held a hearing on Bennett's request to change Noah's surname, which was the only unresolved issue in the case.  Noah was nine years old at the time of the hearing and did not testify.  Bennett, Lana, and Sharon testified.

¶6.    When asked why he wanted to change Noah's name, Bennett answered, "I want him to carry . . . his family name . . . . My father passed my name down to me, and I want to pass it down to my children."  Bennett testified that he had no other reason for requesting the name change.  Lana acknowledged that Bennett "started paying [child] support some years ago."  Otherwise, Bennett was not "in the picture" until he sought visitation in 2016.

¶7.    Lana and Sharon both testified that they feared that changing Noah's name would have a negative impact on him.  Sharon testified that when Noah "started school, he became sullen and angry and uncooperative," and eventually he was "suspended" from school at age five.  As a result, Sharon homeschooled Noah for two and a half years until they were able to enroll him in school in Kentucky.  Sharon testified that Noah continues to have behavior problems at school, but they have been able to work through the issues with the school.  Sharon said they were still in a "tentative situation" with Noah.  Sharon was concerned that a name change could make Noah "confused" or "angry" and that someone at school might tease him about his new name.  She feared that would lead to "the problem of [Noah] deciding he doesn't want to go to school again."  Lana similarly testified that she feared that Noah would be bullied at school because of a sudden name change.  Lana also testified, "I feel like . . . Mr. Bennett had opportunities to change the name and decided not to because he felt like the child was not his and didn't want to take responsibility for his child."

¶8.     At the beginning of the hearing, the chancellor stated that the Mississippi Supreme Court has been "pretty emphatic that the child shall take the last name of the father." The chancellor acknowledged that there is an "exception" to the rule, but he stated that "[t]he exception that's permitted isn't mere embarrassment or confusion for the child or potential embarrassment or confusion or things like that that may result from the name being changed." The chancellor cited *Rice v. Merkich*, 34 So. 3d 555 (Miss. 2010), for this point. The chancellor further stated:

> The Court could make an exception . . . if the circumstances are such that it is just really a traumatic kind of thing that would make it just absolutely inappropriate for the child to carry the father's name. [For example, if there is] something seriously wrong with the father, such as, let's say that hypothetically . . . I was trying to think of some reason why I might do this. If the mother were raped and the child was the result of a heinous thing like that. Or the father was a pedophile and had been abusing the child. Or something that's just really just detrimental and the child should not ever have to go around carrying that name. That is a logical reason to do it. You know, you may be able to think of some other reason that the Supreme Court would go along with, but those are the kind of drastic measures that the Supreme Court may or may not.

¶9.     At the conclusion of the hearing, the chancellor granted Bennett's request to change Noah's surname, explaining his ruling as follows:

> Well, I can certainly understand the reluctance to want to have the child's name changed to that of the father. I think that there are certainly some reasons that she could point to and say it would be in the child's best interest to leave it as it is. I don't think that they meet the criteria that the Supreme Court has set for us to be able to change the name or to allow the name to be different from what the statute says. The statute says that the child shall carry the father's name. And so I must reluctantly deny the request to have it changed -- or, rather, to deny it to remain the same as the mother's. And I will order that it be changed to be the father's name.

¶10.    The chancellor subsequently entered a judgment ordering that Noah's birth certificate

4

should be amended to change his last name to Bennett and to list Bennett as his father. The chancellor effectively stayed the judgment pending appeal by ordering that the judgment should not be registered with the Mississippi Department of Vital Records or otherwise effectuated until after Lana had exhausted her appeals.

**ANALYSIS**

¶11. On appeal, Lana argues (1) that the chancery court's ruling should be reversed because "it would not be in [Noah's] best interest to change his surname" and (2) that the statutory "presumption" that a child shall be given the father's surname violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[3]

¶12. "This Court 'will not disturb the factual findings of a chancellor when supported by substantial evidence unless the Court can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard.'" *Rice*, 34 So. 3d at 557 (¶7) (quoting *Powers v. Tiebauer*, 939 So. 2d 749, 752 (¶6) (Miss. 2005)). "When reviewing questions of law, this Court employs a de novo

---

[3] Lana's second argument challenges Mississippi Code Annotated section 93-9-9(1), as interpreted by our Supreme Court in *Rice*, *supra*. As discussed below, the majority opinion in *Rice* held that the statute places the "burden of proof" on the party who contends that the child should not have the father's surname. *Rice*, 34 So. 3d at 557 (¶¶8-9). The majority opinion in *Rice* did not use the term "presumption," but Justice Lamar's dissent fairly characterized the majority opinion as establishing a "presumption" in favor of the paternal surname. *Id.* at 562 (¶26) (Lamar, J., dissenting). We note that Lana apparently did not comply with Mississippi Rule of Appellate Procedure 44(a), which requires a party challenging the constitutionality of a statute to serve a copy of her brief on the Attorney General. M.R.A.P. 44(a); *see also 5K Farms v. Miss. Dep't of Revenue*, 94 So. 3d 221, 224-25 (¶¶11-13) (Miss. 2012) (discussing an appellate court's discretion to decline to consider a constitutional issue when a party fails to comply with Rule 44(a)). However, this issue is moot because we decide the case on other grounds.

standard of review and will only reverse for an erroneous interpretation or application of law." *Id.* (quoting *Powers*, 939 So. 2d at 752 (¶6)).

¶13.  We first address Lana's argument that the chancery court's ruling should be reversed because it would not be in Noah's best interest to change his surname.[4] The parties agree that this case is governed by Mississippi Code Annotated section 93-9-9(1), which provides in relevant part that "the surname of the child shall be that of the father, unless the judgment specifies otherwise." The parties also agree that our Supreme Court's decision in *Rice*, *supra*, provides the authoritative interpretation of section 93-9-9(1). As noted above, the chancellor also cited *Rice* as binding precedent on this issue.

¶14.  In *Rice*, the father (Merkich) and mother (Rice) were living together when Rice became pregnant, but their relationship ended a few months later, before their daughter (Presley) was born. *Rice*, 34 So. 3d at 556 (¶¶2-3). Merkich accompanied Rice to doctor's appointments and contributed to her medical bills during the pregnancy. *Id.* at (¶2). Merkich was not present for Presley's birth only because Rice did not inform him when she went into labor early. *Id.* at (¶3). However, Merkich filed a petition to determine paternity less than two weeks after Presley was born. *Id.* at (¶4). Once paternity was established, Merkich promptly filed a petition to determine custody and visitation, acknowledged his obligation to pay child support, and requested that Presley's surname be changed to Merkich. *Id.* He did all this within sixty days of Presley's birth. *Id.* The chancery court subsequently awarded

---

[4] *See Warner-Lambert Co. v. Potts*, 909 So. 2d 1092, 1093 (¶3) (Miss. 2005) ("It is well-settled by decision of this Court that a constitutional question will be passed on where the issues involved in a particular case are such that the case may be decided on other grounds.").

joint legal custody to Rice and Merkich, physical custody to Rice, and visitation to Merkich. *Id.* at (¶5). The court also found that Presley's surname should be changed to Merkich. *Id.* Rice appealed the name change. *Id.*

¶15.   On appeal, the Supreme Court held that under section 93-9-9(1), *supra*, a chancery court should change a child's surname to that of the father unless the mother proves by a preponderance of the evidence that it would not be "in the child's best interest" to change the child's name. *Id.* at 557 (¶¶8-9). Applying this standard, the Supreme Court affirmed the chancery court's ruling. *Id.* at 559 (¶16). The Court noted that if Rice had informed Merkich of Presley's birth, Merkich could have acknowledged paternity by completing the proper forms at the hospital, in which case Presley would have been given his surname. *Id.* at 558 (¶10). In addition, the Court stated that "[t]he only evidence offered by Rice that Presley should not have the surname Merkich" was Rice's own testimony about "possible embarrassment and confusion for Rice and Presley to have different names." *Id.* at 559 (¶13). Moreover, at a hearing held a few days after Presley's first birthday, "Rice testified that Merkich [was] a good father, who [was] very involved in Presley's life and spen[t] as much time with her as possible." *Id.* at (¶15). On those facts, the Supreme Court held "that Rice failed to prove by a preponderance of the evidence that it [was] in the child's best interest that her surname not be Merkich." *Id.* at (¶16).[5]

---

[5] In dissent, Justice Lamar argued that the father, as the party requesting relief, should bear the burden of proof. *Id.* at 562 (¶26). Justice Lamar further argued that the chancery court in *Rice* had not made a "best interest" determination but rather had misinterpreted the statute as mandating that the child's surname be changed to that of the father. *Id.* at 562-63 (¶27). Justice Lamar also reasoned that a statutory "presumption" in favor of the paternal surname "would raise serious Equal Protection concerns." *Id.* at 562 (¶26).

¶16.    In this case, the chancellor cited *Rice*, but many of the chancellor's statements were inconsistent with *Rice*'s best-interest/preponderance-of-the-evidence standard.  As noted above, the chancellor began the hearing by suggesting that he could make an "exception" to the rule that a "child shall take the last name of the father" only if Lana proved that "the circumstances are such that it is just really a traumatic kind of thing that would make it just absolutely inappropriate for the child to carry the father's name."  The chancellor further stated that he could make an exception if there was "something seriously wrong with the father"—for example, if the father had raped the mother or "was a pedophile and had been abusing the child."  The chancellor indicated that some other "drastic" set of facts might justify an exception, although he did not provide additional examples.  At the conclusion of the hearing, the chancellor recognized that there were "certainly some reasons that [Lana] could point to and say it would be in [Noah's] best interest to leave [his name] as it is."  But the chancellor then concluded:  "I don't think that [Lana's reasons] meet the criteria that the Supreme Court has set for us to be able . . . to allow the name to be different from what the statute says.  The statute says that the child shall carry the father's name."  The chancellor then "reluctantly" ordered Noah's surname to be changed to Bennett.

¶17.    The chancellor's statements imply a misreading of the majority opinion in *Rice*.  Lana was not required to prove that there was "something seriously wrong" with Bennett or that it would be "absolutely inappropriate" for Noah to have Bennett's surname.  Nor was Lana required to prove that Noah would be traumatized by a name change.  Under *Rice*, Lana only needed to show, by a mere preponderance of the evidence, that it would not be in nine-year-

old Noah's "best interest" to change his name. *Rice*, 34 So. 3d at 557 (¶¶8-9). We conclude that Lana met her burden and that the chancellor manifestly erred by ruling otherwise.

¶18. To begin with, the facts of this case are materially different from the facts of *Rice*. In *Rice*, Merkich took action when Presley was only weeks old so that she was barely one year old when her name was changed. As Justice Lamar put it, Presley was still "too young even to know her last name." *Id.* at 563 (¶28) (Lamar, J., dissenting). In contrast, Bennett did not seek visitation with Noah or take any action to change his name until Noah was nearly eight years old. Thus, Noah was nine years old by the time of the hearing in the chancery court,[6] certainly old enough to have become accustomed to his name.

¶19. Moreover, Lana presented some evidence to support her contention that it was not in Noah's best interest to change his surname. Lana and Sharon could not and did not testify that a name change would result in certain harm to Noah, but that is to be expected. In most cases, it will be difficult, if not impossible, for a mother to produce objective evidence that a name change will cause a specific, certain harm to her child. Nonetheless, Lana and Sharon provided legitimate reasons why it would not be in Noah's "best interest" to change his name. Indeed, at the conclusion of the hearing, the chancery court recognized that "certainly" there were "some reasons that [Lana] could point to and say it would be in [Noah's] best interest to leave [his name] as it is." Given Noah's age and history of behavioral issues at school, it was reasonable for Lana and Sharon to be concerned that a sudden name change could have a negative impact on him.

---

[6] Noah is now ten years old.

9

¶20. On the other side of the scale, Bennett presented no reason or evidence that it would be in *Noah's* best interest to change his name at age nine. Bennett stated only, "I want him to carry . . . his family name . . . . My father passed my name down to me, and I want to pass it down to my children." Bennett's feelings are understandable, but he failed to act on them—or even pursue visitation with Noah—until Noah was nearly eight years old. More important, *Bennett's* desire to pass on his family name is not the equivalent of *Noah's* best interest. "[*T*]*he child's* best interest" is not the same thing as "either parent's best interest." *Vassar v. Vassar*, 228 So. 3d 367, 375 (¶26) (Miss. Ct. App. 2017). Put simply, "[t]he relationship of parent and child is not for the benefit of the parent, but of the child." *Reno v. Reno*, 253 Miss. 465, 475, 176 So. 2d 58, 62 (1965) (quoting J.W. Bunkley Jr. & W.E. Morse, *Amis on Divorce and Separation in Mississippi* § 8.01 (2d ed. 1957)).

¶21. In summary, Lana presented legitimate reasons that it was not in Noah's best interest to change his name, while Bennett presented no reason that a name change would benefit Noah. Lana met her burden of proof under *Rice*, and the chancery court manifestly erred to the extent that it concluded otherwise. Accordingly, we reverse and render the judgment of the chancery court insofar as it ordered Noah's surname to be changed.[7] Noah's last name shall remain Olson.

¶22. **REVERSED AND RENDERED.**

**LEE, C.J., GRIFFIS, P.J., BARNES, CARLTON, FAIR AND TINDELL, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART**

---

[7] The chancery court also ruled that Noah's birth certificate should be amended to show Bennett as his father. Lana does not challenge that part of the chancery court's judgment, and our decision has no impact on it.

**WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING, P.J., AND GREENLEE, J.**

**WESTBROOKS, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶23.    I write separately because I concur in part and dissent in part from the majority. I agree that Olson did not properly provide notice to the Attorney General's Office, and therefore her constitutional claim is procedurally barred. But, I respectfully dissent because I believe that Olson did not meet the burden of proof required by *Rice*[8] and would affirm the chancellor's decision.

¶24.    On appeal, Olson asserts that the chancellor erred in finding that Noah's surname should be changed to Bennett. I disagree. The applicable Mississippi Code Annotated section 93-9-9(1) states that "[i]n the event of court-determined paternity, the surname of the child shall be that of the father, unless the judgment specifies otherwise." Because Bennett's paternity was court-established, Olson's claim focuses on the "unless the judgment specifies otherwise" clause of the statute, and this is the only section of the statute she raises on appeal for this Court's consideration. Olson asserts that the chancellor had the ability to allow Noah to maintain his surname and chose not to.

¶25.    The Mississippi Supreme Court has held that where a party to the action contends that the surname should not be "that of the father," then, and in that event, that party must prove by a preponderance of the evidence that it is in the child's best interest that the surname not be "that of the father." *Rice v. Merkich*, 34 So. 3d 555, 557 (¶8) (Miss. 2010). Here, it was Olson's responsibility to prove that it was not in Noah's best interest to take Bennett's

---

[8] 34 So. 3d 555 (Miss. 2010).

11

surname. In support of her assertions, Olson stated that Bennett had not established himself as a father figure and had been void from Noah's life for eight years. During the hearing, Olson and her mother testified that it might be difficult to change all of Noah's official documents and may subject him to bullying at school. The chancellor held that these reasons, while valid, did not meet the burden of proving that it was in the best interest of Noah for his last name to remain Olson. I agree.

¶26. Olson attempted to differentiate her case from *Rice v. Merkich*, which is binding precedent in Mississippi. However, I find that their cases are analogous. In *Rice*, the father, Scott Merkich, was not present for the child's birth because the mother, Jessica Rice, did not alert him to the birth until days later. *Rice*, 34 So. 3d at 556 (¶3). Once paternity was established, Merkich immediately filed for child custody, visitation, a change of surname, and stated that he would pay his child support obligations. *Id*. at (¶4). At trial, Rice presented evidence that changing the child's surname would be embarrassing and confusing, therefore, the child should maintain her surname. *Id.* The chancellor did not find the evidence persuasive and ordered that while Rice would maintain custody and receive temporary child support, Merkich would have reasonable visitation and that the child's surname would be changed to Merkich. *Id*. at (¶5). Rice appealed. *Id.* On appeal, the Mississippi Supreme Court ruled that Rice failed to prove by a preponderance of the evidence that it was in her child's best interest that her surname not be changed to Merkich and affirmed the chancery court's decision. *Id.* at (¶18).

¶27. Olson contrasted her case by highlighting that Bennett was present at the birth and

12

chose not to sign the birth certificate or petition the court for a name change years after the DNA testing, stating that hers and Rice's lives were in "direct contrast." Although, Bennett waited eight years to petition the court for a name change, the same standard of proof was needed to deviate from the statute. Olson, similarly to Rice, only presented evidence that her child's surname should remain as hers to avoid "possible embarrassment and confusion." *Id.* at (¶13). Additionally, like in *Rice*, Bennett has attempted to establish himself as a father figure in Noah's life. Bennett began paying child support prior to a court order and, further, Noah lives with Bennett three months out of the year. In both *Rice* and the present case, the chancellor found the potential for confusion and embarrassment insufficient to show the child's surname should not be changed to the father's.

¶28.    The majority contends that the chancellor reluctantly ordered Noah's surname to be changed, although the record reflects differently. The chancellor made it very clear at the beginning of the proceedings that there were exceptions to the mandate that the child take the father's surname and was very clear that potential embarrassment and confusion would not be sufficient evidence to overcome the burden. Olson only presented evidence of that kind.

¶29.    Additionally, we review this case for abuse of discretion:

> This Court will not disturb the factual findings of a chancellor when supported by substantial evidence unless the Court can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard.

*Rice*, 34 So. 3d at 557 (¶7) (internal quotation mark omitted) (quoting *Powers v. Tiebauer*, 939 So. 2d 749, 752 (¶6) (Miss. 2005)). The Supreme Court of Mississippi has held that

13

when appellate courts:

> [R]eview[] a decision that is within the trial court's discretion, it first asks if the court below applied the correct legal standard. If the trial court applied the right legal standard, then this Court will affirm a trial court's decision unless there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors.

*Scoggins v. Ellzey Beverages Inc.*, 743 So. 2d 990, 996 (¶27) (Miss. 1999). I do not believe that we can find that the chancellor abused his discretion in following Mississippi Code Annotated section 93-9-9(1) and mandating that Noah's name be changed to the surname of his father's.

¶30. Moreover, the role of this Court is not to substitute our ruling for that of the trial court's. This Court has found that we "cannot substitute its judgment of credibility for that of the trial court, and where the record contains substantial evidence to support the trial court's decision, this Court lacks authority to reverse that decision." *Barnett ex rel. Gordon v. Lauderdale Cty. Bd. of Sup'rs,* 880 So. 2d 1085, 1089 (¶10) (Miss. Ct. App. 2004). In light of the standard in *Rice*, I believe that there was substantial evidence to support the chancellor's decision.

**IRVING, P.J., AND GREENLEE, J., JOIN THIS OPINION.**